FENNEMORE CRAIG, P.C.
Christopher H. Byrd, Esq. (NV Bar No. 1633)
Anthony W. Austin, Esq. (NV Bar No. 10850)
300 S. Fourth Street, Ste. 1400
Las Vegas, NV 89101
Telephone:  (602) 916-5343
Facsimile:  (602) 916-5543
Email: cbyrd@fclaw.com
          aaustin@fclaw.com

HOBART LINZER LLP
C. Dana Hobart, Esq. (CA Bar No. 125139) *(Pro Hac Vice Pending)*
Joseph M. Wahl, Esq. (CA Bar No. 281920) *(Pro Hac Vice Pending)*
777 S. Figueroa St., Ste. 4000
Los Angeles, CA 90017
Telephone:  (213) 225-8900
Facsimile: (213) 225-8929
Email:  dhobart@hobartlinzer.com
          jwahl@hobartlinzer.com

*Attorneys for Aerodynamics Incorporated
and ADI Holdings Company, Inc.*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEVADA

AERODYNAMICS INCORPORATED, a
Michigan corporation; ADI HOLDINGS
COMPANY INC., a Georgia corporation,

Plaintiffs,

v.

CAESARS ENTERTAINMENT
OPERATING COMPANY, INC., a
Delaware corporation; STEVEN
MARKHOFF, an individual;
INTERNATIONAL MANAGEMENT
SOLUTIONS LLC, a Delaware
corporation; VIA AIRLINES, INC., a
Colorado corporation; VIA AIR, LLC, a
Delaware corporation; and AMOS
VIZER, an individual,

Defendants.

CASE NO.  2:15-cv-1344

**COMPLAINT FOR**

**(1) MISAPPROPRIATION OF TRADE
     SECRETS;**

**(2) BREACH OF CONTRACT; AND**

**(3) BREACH OF THE IMPLIED
     COVENANT OF GOOD FAITH AND
     FAIR DEALING**

**JURY DEMAND**

Plaintiffs Aerodynamics Incorporated and ADI Holdings Company, Inc. for their

complaint against defendants Caesars Entertainment Operating Company, Inc., Steven Markhoff,

10622375

International Management Solutions LLC, Via Airlines, Inc., Via Air LLC, and Amos Vizer,

allege as follows:

## JURISDICTION AND VENUE

1.       Subject matter jurisdiction of this Court is based on 28 U.S.C. § 1332, in that the

action is between a citizen of Nevada and citizens of foreign states and the matter in controversy

exceeds the value of $75,000, exclusive of interest and costs.

2.       Venue is proper in this Court under 28 U.S.C. § 1391 in that a substantial part of

the events or omissions giving rise to Plaintiffs' claims occurred in this judicial district and that

the operative agreements specify that any action or proceeding arising out of such agreements

must be commenced in this judicial district.

## THE PARTIES

3.       Plaintiff Aerodynamics Incorporated, is a Michigan corporation with operations in

Beachwood, Ohio, and Kennesaw, Georgia.

4.       Plaintiff ADI Holdings, Inc. ("Holdings"), is a Georgia corporation with

operations in Kennesaw, Georgia.  Plaintiff Aerodynamics Incorporated was a wholly owned

subsidiary of Holdings and both are referred to herein collectively as "ADI" unless otherwise

indicated.

5.       Defendant Caesars Entertainment Operating Company, Inc. ("Caesars") is a

Delaware corporation with its principal place of business in Clark County, Nevada.

6.       Defendant Steven Markhoff is an individual residing in, and a resident of, Clark

County, Nevada.  Mr. Markhoff is the vice president of ESS Travel Management, a subsidiary of

Caesars.  Mr. Markhoff is also the managing member of defendant International Management

Solutions, LLC.

FENNEMORE CRAIG
PROFESSIONAL CORPORATION

7. Defendant International Management Solutions, LLC, ("IMS") is a Delaware limited liability company with its principal place of business in Clark County, Nevada.

8. Defendant Via Airlines, Inc., formerly known as Charter Air Transport, Inc., is a Colorado corporation with its principal place of business in Maitland, Florida. Via Airlines, Inc., changed its name from Charter Air Transport, Inc., in or about February 2015. Via Airlines, Inc., and Charter Air Transport, Inc., are referred to herein collectively as "Via Airlines" unless otherwise indicated. Via Airlines has transacted business and conducted activities through the trade names Charter Air Transport and Via Air.

9. Defendant Via Air, LLC, formerly known as Mauiva, LLC, is a Delaware corporation with its principal place of business in Maitland, Florida. Via Air, LLC changed its name from Mauiva, LLC, in January 2015. Via Air, LLC, and Mauiva LLC, are referred to herein collectively as "Via Air" unless otherwise indicated.

10. Defendant Amos Vizer, also known as Ami Vizer, is an individual residing in, and a resident of, Orange County, Florida. Mr. Vizer is the Chairman of Via Air. Defendants Via Airlines, Via Air and Ami Vizer are referred to herein collectively as the "Vizer Entities" unless otherwise indicated.

## ALLEGATIONS COMMON TO ALL CLAIMS

### A. Summary Of Action

11. ADI was the victim of a scheme by Defendants to obtain ADI's most highly guarded trade secrets, wrongfully misappropriate those trade secrets in violation of nondisclosure agreements, interfere with ADI's contractual expectancy of a three-year charter air service contract with Caesars, and use ADI's trade secrets to obtain the charter air service contract and to interfere with ADI's contractual relations. All the of the Defendants were fully knowledgeable about the scheme and full participants in carrying it out. Their conduct constitutes not only

FENNEMORE CRAIG
PROFESSIONAL CORPORATION

misappropriation of trade secrets, but also breach of nondisclosure agreements, and breach of the duty of good faith and fair dealing.  As alleged herein, ADI is entitled to recovery of compensatory damages in excess of $12 million as well as punitive damages for Defendants' willful misappropriation and disregard of ADI's rights in its trade secrets.

12.     ADI is one of the country's leading full-service aviation service providers. Founded in 1959, ADI has multiple operating bases in the U.S.  ADI is certified as an air carrier pursuant to Federal Aviation Regulation Part 121 giving it regulatory authority to fly as a commuter airline.  ADI operates charter flights using Embraer ERJ 145 regional jets.  ADI has served the industry for 55 years without incident or accident, one of only two companies operating regional jets in the supplemental 121 on-demand regime able to make this claim.

13.     Caesars owns, operates, or manages casinos in five countries on three continents. Within the United States, Caesars owns, operates, or manages casinos in 14 states, primarily under the Caesars, Harrahs, or Horseshoe brand names.  Among Caesars operating units is its ESS Travel Management division.

14.     On October 1, 2014, Scott Beale, then the President, Chief Operating Officer, and owner of ADI (through holding companies), was contacted by Steven Markhoff, Vice President ESS Travel Management for Caesars, who solicited ADI to bid on Caesars' Master Air Transportation Charter Agreement (the "Charter Agreement") to provide charter jet service to bring Caesars patrons to and from Caesars' properties across the United States over a period of three years.

15.     ADI made a bid and, thereafter, Caesars and ADI negotiated the terms of the Charter Agreement.  Had ADI and Caesars entered into the Charter Agreement, ADI's projected revenue over the three year duration was at least $85 million and its profits would have been at least $12 million.

FENNEMORE CRAIG
PROFESSIONAL CORPORATION

16.     ADI and Caesars did not enter into the Caesars Charter Agreement, however. Instead, the Charter Agreement was awarded to an ADI competitor, defendant Via Airlines which is owned and controlled by defendant Ami Vizer.  (June 4, 2015 Caesars/Via Airlines press release, attached hereto as **Exhibit 3**.)  However, Via Airlines was not a Part 121 certified air carrier and had no experience operating jet aircraft, including the Embraer 145 regional jets called for in the Caesars request for proposal.  Thus, Via Airlines was only able to obtain the Charter Agreement by, together with Caesars and Mr. Markhoff, misappropriating ADI's trade secrets and confidential information about ADI's business in general, and its planned operation of the Charter Agreement in particular.

17.     The central figure in the misappropriation of ADI's trade secrets was Caesars' Vice President, Mr. Markhoff.  Between October 2014 and February 2015, ADI shared its most sensitive and confidential business information with Mr. Markhoff and Caesars under a non-disclosure agreement that prohibited the use of ADI's confidential information for any purpose other than evaluating ADI's ability to operate the Charter Agreement.  (October 2, 2014, Caesars nondisclosure agreement ("Caesars NDA"), attached hereto as **Exhibit 1**.)  On and after January 16, 2015, Caesars and Mr. Markhoff breached their nondisclosure obligations and, together with the Vizer, Entities misappropriated ADI's trade secrets, by obtaining ADI's confidential business information to deprive ADI of the Charter Agreement, to enable the Vizer Entities and Mr. Markhoff to obtain the Charter Agreement instead through Via Airlines, and to harm ADI's business and its relationships with its customers and vendors.

**B.     The Initial Relationship Between Caesars And ADI, And The Caesars Non-Disclosure Agreement.**

18.     On October 1, 2014, Mr. Markhoff, as Vice President of Caesars' ESS Travel Management division, contacted Mr. Beale to discuss Caesars' requirements for the Charter Agreement.

10622375

FENNEMORE CRAIG
PROFESSIONAL CORPORATION

19.     While Caesars opened the Charter Agreement bidding to "everyone and their mother," to be eligible to win the Charter Agreement, an operator was required to hold an FAA Part 121 certificate.  Caesars' request for proposal, provided to ADI on or before October 22, 2014, also required that a potential bidder be able to provide at least three and possibly four Embraer ERJ-145 or Canadair CRJ-200 regional jets.

20.     To facilitate the bid process and related negotiations, ADI and Caesars entered into the Caesars NDA effective October 2, 2014.  (Exhibit 1).  The Caesars NDA broadly restricted the use and disclosure of confidential information:

> For the purposes of this Agreement, "Confidential Information" shall mean any and all information or material of a party, whether revealed orally, visually, or in tangible or electronic form, that is not generally known to the public, including, information relating to personnel, employees, consultants and contractors, marketing strategies, sales and marketing data, customer lists (including the identity of actual and potential customers), supplier lists (including the identity of actual and potential suppliers), operations, business procedures, trade secrets, know-how, capabilities, product designs, drawings, specifications, program code, notes, analyses, compilations, studies, forecast, interpretations, or other documents prepared by the Recipient or its representatives that derive from, contain, reflect or are based upon, in whole or in part, the information furnished by the Disclosing Party, and information regarding future technical, business, and marketing plans, and product strategies.  In addition to the foregoing, Confidential Information shall include all information in tangible form and marked "confidential" or with words of similar effect and all information identified as confidential at the time of oral disclosure.

(Caesars NDA, § 3(a).)

21.     The Caesars NDA provided that Caesars was "in a relationship of confidence with respect to the Confidential Information disclosed by ADI."  The restrictions of the Caesars NDA extended to Caesars' "officers, partners, directors, employees, accountants, lawyers, advisors and other representatives (collectively 'Related Persons')."  Importantly, the Caesars NDA provided

that Caesars is "responsible for any acts or omissions of its Related Persons that result in breach of" the Caesars NDA.

22.    The Caesars NDA is to be "governed and construed in accordance with the laws" of Nevada, and any action "arising out of or related to this Agreement shall be commenced in a state or federal court of or in the State of Nevada." The parties agreed to submit to such jurisdiction and venue "in any such suit, action or proceeding between or among [ADI] or any of its Related Persons and [Caesars] or any of its Related Persons." The prevailing party in any "litigation or other proceeding" between ADI or its Related Persons and Caesars or its Related Persons may seek reasonable attorneys fees and costs.

**C.    Caesars And ADI Negotiate The Charter Agreement.**

23.    On or about October 9, 2014, Mr. Markhoff traveled to ADI's main offices and operations in Kennesaw, Georgia. Mr. Markhoff met with Mr. Beale to begin negotiating the Charter Agreement. During his visit to ADI, Mr. Markhoff reviewed ADI's operational costs and confidential agreements including ADI's confidential Embraer Pool Parts Agreement, its Rolls Royce engine contracts, and its maintenance flow down agreements from its aircraft lessors, Republic Holdings and Cymus Holdings. ADI also provided Mr. Markhoff with a verification of costs and operating results from its business, including insurance matters, ADI's proprietary maintenance program, and a cost analysis presentation. In addition, at Mr. Markhoff's request, ADI provided him with a digital thumb drive containing ADI's Federal Aviation Administration-approved manuals and operations specifications.

24.    On or about October 30, 2014, ADI and Caesars met at ADI's Ohio facility to further negotiate the Charter Agreement. Caesars was represented by Mr. Markhoff, Matthew Levin, who held the title "President's Associate – ESS Travel Management," and Emmanuel Lawrence, who held the title "Category Director, Facilities – Design & Construction for Caesars

Strategic Sourcing."  ADI was represented by Mr. Beale and other ADI executives.  During this visit to ADI, the Caesars employees made an additional review of ADI's confidential and trade secret information including data regarding ADI's costs and operations.

25.     Over the course of the Caesars negotiations with ADI, Caesars had access to and reviewed more than 130 separate items of confidential ADI trade secret material.

26.     On November 11, 2014, Mr. Markoff sent Mr. Beale a Preliminary Overview of Proposed Terms For Caesars Entertainment and ADI (the "Deal Sheet").  This Deal Sheet reiterated that "Caesars require[d] 3-4 50 seat regional jets to support its air charter program."  Two of the aircraft were to be based in Atlantic City, New Jersey, one in Laughlin, Nevada, and possibly a fourth based in Tunica, Mississippi.

27.     On November 17, 2014, Mr. Markoff wrote to Mr. Beale stating that as "far as we (Caesars) are concerned we are operating on the premise that we have a deal based on the terms in the deal sheet.  We are also working on the plan to have you operating the first 2 50 seaters in Atlantic City April 1st."  Mr. Markoff added that once "we get the draft contract agreed to, I need to get our legal department to bless it and take it to our executive committee for final approval – this will be a perfunctory step."

28.     On December 1, 2014, Mr. Markoff provided Mr. Beale with the first draft of the Charter Agreement.

**D.     The Flight Test Aviation Lawsuit And Department Of Transportation Inquiry.**

29.     At the outset of the discussions between ADI and Caesars, Mr. Beale informed Caesars that ADI had gone through a Chapter 11 reorganization which it successfully completed in August 2013 and that Mr. Beale had been a defendant in a civil action that arose indirectly from the Chapter 11 reorganization and which had resulted in a judgment against Mr. Beale personally.

10622375

FENNEMORE CRAIG
PROFESSIONAL CORPORATION

30.     Regarding the civil action, during Mr. Markhoff's October 9, 2014, visit to ADI, Mr. Beale informed Mr. Markhoff that a pre-bankruptcy ADI creditor, Flight Test Aviation, was unable to recover satisfactory funds from ADI through the bankruptcy process and, as a result, sued Mr. Beale personally alleging that Mr. Beale was responsible for Flight Test Aviation's investment losses.  Mr. Beale told Mr. Markhoff that Flight Test Aviation had invested $500,000 in ADI and sued Mr. Beale based on alleged representations that a contract was in place with a third party to support charter flights.  At trial, Mr. Beale presented evidence that he never made any representations that a contract was in place, only that such a contract was being negotiated. Nevertheless, a jury found Mr. Beale liable to Flight Test Aviation for civil fraud and awarded damages of $600,000.

31.     At the later meeting at ADI's Ohio facility on October 30, 2014, Mr. Beale and Mr. Markhoff further discussed the Flight Test Aviation matter.  Mr. Markhoff told Mr. Beale in this conversation that Caesars was not concerned about the Flight Test Aviation matter because it was a civil action involving Mr. Beale as an individual and because there are two sides to every story.

32.     ADI and Mr. Beale also disclosed the Flight Test Aviation lawsuit in answer to Caesars' business information questionnaire asking whether ADI or its principals had "ever been named as a defendant in litigation alleging fraud, deceit or similar claims."  Caesars uses this questionnaire as part of  its efforts to conduct background investigations of potential contracting parties which Mr. Markhoff described as being very exhaustive due to gaming business requirements.

33.     Mr. Beale further informed Mr. Markhoff that ADI had disclosed the Flight Test Aviation lawsuit to the Department of Transportation ("DOT") on June 25, 2014, in connection with ADI's application to obtain a certificate to operate flights between Youngstown-Warren

10622375

FENNEMORE CRAIG
PROFESSIONAL CORPORATION

Regional Airport and Chicago O'Hare International Airport and that, while processing ADI's

application, the DOT had begun a review of ADI's fitness to conduct operations.

> **E.   Caesars And ADI Reach Agreement On The Charter Agreement.**

34.     Being fully informed of ADI's bankruptcy, Mr. Beale's civil judgment, and the

pending DOT application for scheduled authority, Caesars encouraged ADI to bid on the Charter

Agreement and, thereafter, the parties negotiated the terms of the Charter Agreement.

35.     Throughout the Charter Agreement negotiations, Mr. Beale regularly updated Mr.

Markhoff of the status of the DOT inquiry.  For instance, on December 11, 2014, while providing

ADI's comments on the first draft of the Charter Agreement, Mr. Beale wrote to Mr. Markhoff

stating that "our DOT scheduled authority remains pending.  We will have before we start the

agreement but want to make sure you are aware."

36.     Five days later, on December 17, under the subject line "Good News," Mr.

Markhoff emailed Mr. Beale and said it "looks like we will take your bid for the charter, we will

get the signed quote back to you shortly."  Later that same day, Mr. Markhoff wrote to Mr. Beale

stating that Caesars "would like to wrap this up as soon as possible."  On December 27, Mr.

Markhoff wrote to Mr. Beale stating that "[w]e are fine with the latest changes [to the draft

Charter Agreement and] . . .  am sending to our legal department for final review."  Neither Mr.

Beale's civil judgment nor the DOT inquiry was raised by Caesars as posing any impediment to

ADI and Caesars entering into the Charter Agreement.  In fact, in early January 2015, Mr.

Markhoff reported to Mr. Beale that Mr. Beale and ADI had passed Caesars' background

investigation.

37.     As of January 12, 2015, Caesars' legal department had reviewed and approved the

Charter Agreement with minor revisions.  The Caesars legal department raised no issue regarding

the civil judgment or the DOT inquiry.  By January 21, 2015, it appeared that Caesars and ADI had agreed upon a final version of the agreement.

**F.    The DOT's Order To Show Cause And ADI's Immediate Remedial Action.**

38.    As alleged above, the DOT's inquiry emanated from ADI's application for an interstate scheduled certificate to operate round trip flights between Youngstown-Warren Regional Airport and Chicago O'Hare International Airport.  As part of its application, ADI identified the Flight Test Aviation lawsuit and, during the pendency of the ADI's application, the DOT became aware of the civil judgment.

39.    On January 22, 2015, the DOT issued an Order to Show Cause ("OSC") proposing to deny ADI's application for interstate scheduled passenger authority.  The OSC also tentatively proposed to revoke ADI's certificates for interstate and foreign air charter transportation.  Mr. Beale emailed Mr. Markhoff a copy of the OSC that same day.

40.    The OSC was primarily based on Mr. Beale's civil judgment and ADI's alleged failure to bring it to the DOT's attention more quickly.  The DOT tentatively concluded that Mr. Beale's roles at ADI raised questions as to ADI's compliance disposition and managerial competency.

41.    ADI took immediate actions to resolve the DOT's concerns, reestablish ADI's fitness to operate as a scheduled carrier, and prevent any adverse action from being taken regarding ADI's certificates.  Effective January 26, 2015, Mr. Beale stepped down as CEO, President, and Chairman of the Board of ADI and its parent companies.  Darrell Richardson was named as Mr. Beale's successor, other new senior management was appointed, and three new board members were appointed to the boards of ADI and its parent companies.  Mr. Beale also committed to sell his interest in ADI over a relatively short period of time.

42.     On February 5, 2012, ADI informed the DOT of these steps and Mr. Markhoff was informed as well.  Satisfied with the prompt and comprehensive action taken by ADI, on February 13, 2015, the DOT wrote to ADI and stated that "based on the information provided by ADI, it is the Department's intention to defer further action within the timeframe ADI has requested."  Mr. Markhoff was immediately informed of the DOT's position.  (Later, on March 26, 2015, ADI's regulatory counsel reconfirmed to Caesars that ADI had taken these steps and reaffirmed that ADI continued "to possess its full DOT and FAA authority to provide charters to Caesars.")

43.     As of the date of the filing of this complaint, ADI possesses all certificates to conduct interstate and foreign charter air transportation and the DOT has taken no further action regarding the OSC.

### G.     Caesars Conducts Further Review Of ADI's Trade Secret Information.

44.     Even though Caesars was fully aware of the DOT inquiry and moved forward enthusiastically to finalize the Charter Agreement with ADI, when Caesars received the OSC, Mr. Markhoff informed Mr. Beale that Caesars wanted to conduct additional due diligence and provided Mr. Beale with a Due Diligence Checklist for a broad review of ADI's corporate, operational and legal documentation.  Nevertheless, Mr. Markhoff told Mr. Beale on January 22, 2015, that Caesars was supportive of ADI, believed ADI had a solid plan, and had faith in ADI's experienced management team.  He also added that, paradoxically, the DOT action denying ADI's interstate scheduled passenger certificate was good for Caesars because it would make ADI more attentive to Caesars.

45.     ADI fully cooperated with Caesars' request for additional due diligence.  On January 26, 2015, ADI provided Caesars with access to a digital, password-protected, document library containing historical and current financial statements and pro formas, operations manuals,

FENNEMORE CRAIG
PROFESSIONAL CORPORATION

policy manuals, specific operating data, business plan and budgets both for the Caesars Charter Agreement as well as the rest of the ADI, vendor contracts, leases, service agreements, customer lists, and customer contracts.  On January 27, 2015, Mr. Markhoff told Darrell Richardson, who by then was ADI's Chairman, President and CEO, that he had downloaded all of ADI's documents from the digital document library.

46.      Then, on January 27, 2015, Mr. Markhoff and Matt Levin of Caesars arrived at ADI's Ohio facility and, as Mr. Markhoff had requested, ADI gave them complete access to all of ADI's confidential and proprietary information including business plans, contracts, leases, pricing models, customer lists, all financial records, all customer lists, contact information for ADI's lessors, proprietary and special agreements with key suppliers, and profit margin information on the business.  The ADI and Caesars personnel also reviewed and discussed together every document that ADI had posted in the digital document library.

47.      One of the most competitively sensitive items of ADI's confidential information that was shared with Caesars (and subsequently misappropriated by Defendants) was a detailed Excel financial model containing all of ADI's proprietary projections and data regarding how it would operate the Charter Agreement.  This model included highly proprietary information about ADI's projected profit and losses on all of its routes in general and, with respect to the Caesars Charter Agreement in particular, contained projected income on the Caesars routes, crew compensation, maintenance reserves, pilot training costs, aircraft lease rates, and many other categories of data that ADI never shares outside of the company.  This confidential, trade secret model constitutes a roadmap to operating the Embraer 145 50-seat regional jets under the Charter Agreement, was developed at great expense to ADI, and would be immeasurably valuable to Mr. Markhoff and Mr. Vizer.  Mr. Vizer's only experience was operating propeller-driven airplanes

which carry no more than 30 passengers.  Mr. Markhoff has not had experience with regional jets

for over 10 years and, even then, his connection to regional jets was as legal counsel.

### H.    The Fraudulent Offer To Purchase ADI.

48.    Even though he was a Caesars employee purportedly working to advance the

Charter Agreement between Caesars and ADI, during Mr. Markhoff's January 27, 2015 visit to

ADI, Mr. Markhoff told Mr. Beale, in the presence of Caesars' Mr. Levin, that Mr. Markhoff

himself would be interested in purchasing ADI.  Mr. Markhoff had also told Mr. Beale before

arriving that he had met several times with his boss at Caesars, that his boss was aware of Mr.

Markhoff's plans, and had approved them.

49.    During Mr. Markhoff's and Mr. Levin's visit to ADI on January 27, 2015, Mr.

Levin prepared a highly detailed analysis and budget proforma for the acquisition of ADI.  Mr.

Levin's analysis determined the profitability of ADI and what an acquirer could pay Mr. Beale

based on monthly cashflow to purchase his ownership in ADI.

50.    On February 7, Mr. Markhoff, on behalf of defendant International Management

Solutions, LLC ("IMS"), an entity Mr. Markhoff told Mr. Beale he owned or controlled, entered

into a letter of intent with ADI's parent company, Holdings, to purchase Holdings.  (2/7/16 Letter

of Intent (the "LOI"), attached hereto as **Exhibit 2** (Exhibit A omitted).)

51.    The LOI had a binding confidentiality provision:

> The term "Confidential Information" as used in this Agreement
> shall mean all information, including financial information,
> projections, costs, customers and contracts, data, knowledge, and
> know-how (in whatever form and however communicated) relating,
> directly or indirectly, to a party (or to its affiliates or to its or their
> businesses, operations, properties, products, markets, or financial
> positions) that is delivered or disclosed by such party or any of its
> officers, directors, partners, members, employees, agents, affiliates,
> or shareholders (collectively, the Disclosing Party") to the other
> party or any of its officers, directors, partners, members, employees,
> agents, consultants, affiliates or shareholders (collectively, "the
> Receiving Party") in writing, electronically or through visual

means, or which the Receiving Party learns or obtains through observation or through analyses, interpretations, compilations, studies, or evaluations of such information, data, knowledge, or know-how. The burden is on the Receiving Party of proving that any information, data, knowledge, or know-how is not "Confidential Information."

(Id., § 7 (hereafter the "IMS NDA").)  The LOI provided that such confidential information "shall be used by Buyer for performing its due diligence of the Company and shall not be disclosed to any third party other than Buyer's affiliates, assigns, successors, investors, accountants, lawyers and advisors."  (Id.)  Although IMS was permitted to disclose ADI confidential information to its "affiliates, investors and professional advisors," IMS "accept[ed] responsibility for their compliance."  (Id.)  The LOI required ADI to "provide Buyer and its Representatives reasonable access during normal business hours to ADI's facilities, books and records, and provided that Holdings will cause ADI's Representatives to cooperate fully with Buyer and its Representatives in connection with such due diligence investigation."  (Id., § 8.)  "Representatives" was defined as IMS's "members, officers, directors, advisors and agents."  The LOI provided that it is to be "governed and construed in accordance with the laws of the State of Nevada" and that the parties agreed "to the exclusive jurisdiction of the State of Nevada."  (Id., § 9(d).)

**I.    Defendants' Misappropriation Of ADI's Trade Secrets.**

  **1.    Mr. Markhoff Misrepresents The Purpose Of His Visit To ADI's Aircraft Lessor Republic Airlines.**

  52.    Upon executing the LOI, Mr. Markhoff and Mr. Beale discussed the terms of a sale of ADI.  Mr. Markhoff requested that he be authorized to "discuss the status of your Republic aircraft leases with Republic Airlines in furtherance of our due diligence to acquire ADI."  Republic Airlines, a subsidiary of Republic Airways Holdings, was the lessor of four Embraer 145 regional jets to ADI.  On February 9, 2015, Mr. Richardson gave Mr. Markhoff authorization to discuss ADI's aircraft leases with Republic.  Because Caesars was fully aware and approved of

Mr. Markhoff's intentions, Mr. Markhoff acknowledged this authorization by replying using his Caesars' email and under his Caesars title, Vice President ESS Travel Management.

53.     Mr. Markhoff's representation to ADI that his purpose in meeting with Republic was to further due diligence to acquire ADI was false and intended to mislead ADI.  Instead, Mr. Markhoff's true purpose was to obtain secret details of Republic's lease program with ADI for use in replacing ADI with an entity owned and/or controlled by Mr. Markhoff and/or the Vizer Entities.

54.     Because ADI was providing access to its confidential information to Caesars, Mr. Markhoff, and IMS's "affiliates, investors and professional advisors," and also was allowing unsupervised discussions between Mr. Markhoff and ADI's airplane lessor, Republic, Mr. Beale became concerned when Mr. Markhoff unexpectedly asked him what he thought of defendant Ami Vizer.  Mr. Beale replied that he didn't think much of Mr. Vizer as he is ADI's competitor. Then, concerned that Mr. Markhoff had asked the question because Mr. Markhoff's investors might include Mr. Vizer and/or his companies, Mr. Beale directly said to Mr. Markhoff "you aren't working with him, are you?" to which Mr. Markhoff falsely responded, "no way, I am not working with Ami."  Mr. Markhoff wrote in an email to Mr. Beale, that "my partners in this are strategic and they are equity investors."

**2.     Ami Vizer And The Vizer Entities.**

55.     It turns out that, unbeknownst to Mr. Beale or anyone at ADI, Mr. Markhoff was indeed working with Mr. Vizer in order to misappropriate ADI's trade secrets so that one of the Vizer Entities (together with Mr. Markhoff) could obtain the Charter Agreement instead of ADI, steal ADI's customers, and interfere with ADI's contracts with its vendors and lessors.

10622375

FENNEMORE CRAIG
PROFESSIONAL CORPORATION

56.     Mr. Vizer owns or controls the Vizer Entities.  All of the Vizer Entities operate from the same address in Maitland, Florida.  Mr. Vizer is Chairman of Via Air and his wife, Irit Vizer, is president and CEO.

57.     According to its website, Via Air is an "indirect air carrier operating under DOT Regulation 14 CFR 380 together with its subsidiary, Charter Air Transport, d.b.a. Via Airlines ('Via Airlines'), as the Direct Air Carrier on 30 EMB-120 aircraft."  According to DOT records, Via Airlines operated as a direct air carrier on behalf of its sister company Via Air.

58.     From 2012 through at least 2014, the Vizer Entities operated more than 400 flights into and out of McCarran International Airport in Las Vegas, Nevada.

59.     In addition to operating flights to and from Nevada, Mr. Vizer has, on behalf of the Vizer Entities, negotiated contracts with Nevada corporations by telephone, email, and in person, specifically including contracts with Caesars or its subsidiaries or divisions.  According to the press release dated June 4, 2015, jointly issued by Caesars and Via Airlines, Via Airlines "has been operating flights for Caesars since 1997." (Exhibit 3.)

> 3.     **Defendants' Fraudulent Access To ADI's Trade Secrets And Breach Of The Nondisclosure Agreements.**
>
>      a.  **Defendants' Visits To Republic.**

60.     Based on ADI's authorization, which Mr. Markhoff obtained though his fraudulent statements to ADI, Mr. Markhoff met in person with representatives of Republic Holdings (without any ADI personnel present) in Indianapolis, Indiana, and breached his duties of non-disclosure under the Caesars NDA and the IMS NDA.  In a meeting on or about February 9, 2015, attended by Republic's CEO and other Republic executives, Mr. Markhoff disparaged ADI by using the results of the confidential information he had been given by ADI, disclosed to Republic all of his findings regarding ADI, its contracts, its financial status, and falsely said that "ADI is bankrupt."

10622375

FENNEMORE CRAIG
PROFESSIONAL CORPORATION

61.     On or about February 17, 2015, Mr. Markhoff made a second visit to Republic, this time accompanied by Mr. Vizer.  Mr. Vizer's presence at this meeting with Republic was concealed from ADI.  During this meeting, in further breach of Defendants' duties of non-disclosure under the Caesars NDA and the IMS NDA, Mr. Markhoff disclosed significant amounts of ADI's confidential information to the Republic executives and to Mr. Vizer.  Furthermore, both Mr. Markhoff and Mr. Vizer said in this meeting that they would be taking the business from ADI (which they could only do by misappropriating ADI's trade secrets), discussed the proprietary terms of the ADI/Republic aircraft contracts, and said that they intended to step into the shoes of ADI on ADI's aircraft leases with Republic.

**b.  Fraudulent Access To ADI's Trade Secrets By The Vizer Entities' Financial Director.**

62.     Separately, Mr. Markhoff and Mr. Vizer misled ADI into permitting one of Mr. Vizer's executives to visit ADI's Ohio facility for two days and have unfettered access to ADI's confidential trade secret information by falsely representing that the executive was an independent accountant when in reality she was an executive of the Vizer Entities.

63.     On February 11, 2015, Mr. Markhoff represented to Mr. Beale that an independent accounting consultant whom he identified only as "Marina" would visit ADI's Ohio office on February 12, 2015, to perform an accounting audit in connection with the possible purchase of ADI.  Mr. Markhoff wrote to Mr. Beale that Mr. Markhoff's "partners want to see the results of her review before addressing the offer."  No other information about Marina was given to ADI prior to her visit.

64.     ADI later discovered that "Marina" was not an independent accounting consultant as Mr. Markhoff had represented, but rather was Marina Morgan, Financial Director of Mr. Vizer's company, Via Air.

65.     In advance of Marina's visit, ADI informed Mr. Markhoff that she would be strictly limited to reviewing, but not copying, ADI's trade secret information.  When Marina arrived at ADI on February 12, 2015, she refused to answer any questions about her identity posed by ADI employees, did not identify herself other than as "Marina," did not disclose for whom she worked, and concealed the true purpose of her visit.  She requested that ADI give her a list of all its customers, identify the customer representatives, provide a copy of each customer contract, and provide details about those customers.  She also asked to take with her ADI's digital QuickBooks financial database.  These requests appeared to ADI to be unrelated to Mr. Markhoff's possible acquisition of ADI and ADI employees grew suspicious of Marina's true purpose in being at ADI.  When questioned by Mr. Beale, Mr. Markhoff said that ADI was required to cooperate and falsely represented that the purpose of accessing ADI's confidential and proprietary customer information was so that Mr. Markhoff could evaluate ADI's quality of earnings in connection with the acquisition.

66.     Shortly after she arrived the next morning, Marina was discovered taking photographs of ADI's confidential documents which ADI had expressly prohibited.  After making that discovery, ADI told Marina to leave.

67.     The concealment and misrepresentation of Marina's true affiliation, the true purpose of her review of ADI's confidential information, and her access to ADI's trade secret information, were further breaches of Mr. Markhoff's and Caesars' duties of non-disclosure under the Caesars NDA and the IMS NDA as well as a misappropriation of ADI's trade secrets by the Vizer Entities.

### c.  Caesars' Pretextual Termination Of Negotiations With ADI.

68.     Only hours after Marina was told to leave ADI, on February 13, 2015, Mr. Markhoff sent Mr. Beale an email on behalf of IMS "terminating our diligence and our interest in

FENNEMORE CRAIG
PROFESSIONAL CORPORATION

acquiring the company." The following Monday, February 16, 2015, now on behalf of Caesars, Mr. Markhoff wrote to Mr. Richardson stating that "Caesars has elected to no longer pursue a contract with ADI to operate aircraft for the Caesars air network."

### 4. Defendant's Further Acts Of Misappropriation.

69. Though unknown to ADI at the time, it became clear in meetings on or about February 17 and 18, 2015, between Mr. Markhoff, Mr. Vizer, and Republic employees at Republic's headquarters in Indianapolis that the true intent of Caesars, Mr. Markhoff, and Mr. Vizer was to misappropriate ADI's trade secrets, steal ADI's business, and use the purported plan to purchase ADI as a fraudulent cover to carry this out. At this meeting, Mr. Markhoff stated to the assembled group that he was going to be resigning from Caesars to join the Vizer Entities, run the companies, and become an equity investor of the Vizer Entities. Mr. Markhoff stated that he intended to take all of ADI's business and that ADI would be out of business in the very near future. Mr. Markhoff further stated that he, Caesars, and IMS never had an intention to buy ADI, but rather, from the outset of the sham sale process, Mr. Markhoff and Mr. Vizer always intended that the two would be partners and take ADI's business and the Caesars Charter Agreement. Mr. Markhoff said at the meeting, "I never planned to acquire ADI but I do plan to steal ADI's business and put them out of business." Mr. Vizer confirmed these facts in the same meeting.

70. Mr. Markhoff's bold statements caused Republic's CEO to become concerned whether Caesars was aware of Mr. Markhoff's actions. Accordingly, following the meeting alleged in the preceding paragraph, Republic's CEO called the president of Caesars who confirmed that Mr. Markhoff's actions were indeed known to, and approved of, at the highest executive levels of Caesars.

71. Following the meeting at Republic, Republic provided Mr. Markhoff with a term sheet for the Vizer Entities to lease nine aircraft from Republic. Thereafter, Mr. Markhoff sent

10622375

FENNEMORE CRAIG
PROFESSIONAL CORPORATION

redline comments back to Republic which Republic recognized to be the same terms as the ADI leases with Republic.  Republic informed Mr. Markhoff that Republic was not going to duplicate ADI's lease terms for the Vizer Entities.

72.     In further breach of Mr. Markhoff's and Caesars' duties of non-disclosure under the Caesars NDA and the IMS NDA, in the February to March 2015 time frame, Mr. Markhoff contacted ADI's customers and vendors in an effort to interfere with ADI's customers and steal ADI's business.

73.     Among the most damaging acts of interfering with ADI's customer relationships was Markhoff's interference with the contractual relationship between ADI and PASS Charters, Inc.  ADI and PASS had entered into a one year Aircraft Dry Lease Agreement on September 19, 2014 under which ADI leased aircraft (including crew, maintenance, and insurance) to PASS for the operation by ADI of flights to transport PASS's customers via on demand charter flights. PASS is not a direct or indirect air carrier and does not own or operate any aircraft; rather all of PASS's chartered flights are operated by certificated air carriers like ADI who maintain full operational control of charter flights at all times.

74.     During a portion of the February 17-18, 2015, meeting at Republic alleged above, PASS's president, Sue Pavlak, participated by telephone.  During the portion of the meeting attended by Ms. Pavlak, Mr. Markhoff confirmed that the Vizer Entities would support all PASS requirements for regional jet aircraft and replace ADI and the agreement that was in place.  Mr. Markhoff also stated that the Vizer Entities would be less expensive than ADI because, based on Mr. Markhoff's extensive review of ADI's confidential financial and operational records, Mr. Markhoff concluded that ADI did not know how to control costs.

75.     On or about February 19, 2015, Mr. Markhoff and Ms. Pavlak met in Las Vegas to further discuss Mr. Markhoff's plan to interfere with ADI's contract with PASS and conclude a

10622375

FENNEMORE CRAIG
PROFESSIONAL CORPORATION

commitment with PASS that the Vizer Entities would operate the regional jet portion of PASS's charter business.  Subsequently, Ms. Pavlak and the owner of PASS, William Larkin, traveled to the Vizer Entities' offices in Florida to conclude the transaction.

76.     Not coincidentally, on March 2, 2015, PASS purported to terminate its contract with ADI.  Despite PASS not having the contractual right to terminate the ADI contract, PASS nevertheless did so and used, as a pretext, the assertion that PASS's clients refused to use ADI's aircraft.  While such an assertion was not a lawful basis to terminate and constituted a breach of the ADI/PASS contract, PASS later booked several flights with ADI for the same PASS clients, belying its claimed basis for termination.  The breach by PASS, brought about and facilitated by Defendants' misappropriation of ADI's trade secrets, has caused ADI to lose at least $1,000,000 in revenue.  Consequently, ADI has been damaged by Defendants' acts due to the loss of the PASS contract and its associated profit.

77.     More recently, Via Airlines certified an Embraer 145 for Federal Aviation Regulations, Part 135, operations.  Via Airlines flew the aircraft to demonstrate its capabilities to nine National Collegiate Athletic Association colleges that were ADI customers, and whose names Defendants learned by misappropriating ADI's trade secrets, in an attempt to steal ADI's customers.  These colleges represent sales by ADI of approximately $750,000 per college.

78.     Mr. Markhoff further misappropriated ADI's trade secrets by contacting ADI's other aircraft lessor, Cymus, and requesting a term sheet to lease the two aircraft that Cymus was already leasing to ADI.  Mr. Markhoff would have been unable to know ADI's aircraft lessor or the specific aircraft involved without having access to ADI's trade secrets and breaching the Caesars NDA and the IMS NDA.

79.     Mr. Markhoff further misappropriated ADI's trade secrets by contacting aircraft manufacturer, Embraer, and disclosing to Embraer that he had access to and/or a copy of ADI's

Pool Parts Agreement with Embraer.  The Embraer Pool Parts Agreement is a highly negotiated support contract whereby ADI is given access to airframe and other parts, in addition to engineering and other support functions, in exchange payment to Embraer based on hours of aircraft operation.  ADI's Pool Parts Agreement was particularly valuable because ADI collaborated with its lessor, Republic, to take advantage of Republic's own Pool Parts Agreement which covers several hundred Embraer Aircraft.

80.     On May 28, 2015, the Vice President, Sales & Business Development, for Embraer Aircraft Customer Services, Inc., wrote to Mr. Richardson of ADI stating that Embraer was engaged in negotiations with another operator which might soon operate a number of Embraer regional jets into Las Vegas for a "local entertainment company."   Embraer's Vice President wrote that, "much to our surprise and displeasure, we are let [sic] to believe that they have access to a copy of the Embraer - ADI exchange Pool agreement.  This could never be such, as our non-disclosure agreement would not allow ADI to release such document or disclose its content to a 3rd party."  ADI later learned that Embraer was negotiating with Mr. Markhoff.  Mr. Markhoff would have been unable to have access to the Embraer Pool Parts Agreement without having had access to ADI's trade secrets, breaching the Caesars NDA and the IMS NDA, and misappropriating the secret Embraer Pool Parts Agreement.

**J.     Defendants Complete The Misappropriation Of ADI's Trade Secrets And Caesars Awards The Charter Agreement to Charter Airlines.**

81.     On June 4, 2015, Caesars and Via Airlines jointly issued a press release publicly announcing that they had entered into a long-term agreement under which Via Airlines would provide flights on behalf of Caesars.  (Exhibit  3.)  In the joint press release, Via Airlines stated that it would operate the Charter Agreement through its "fleet of owned and leased Embraer jets."  (Id.)

82.     Mr. Markhoff and the Vizer Entities misappropriated ADI's trade secrets in obtaining the Charter Agreement by using ADI's confidential information to construct a jet charter operation where neither had any material experience in such an operation.  By misappropriating ADI's confidential information, Mr. Markhoff and the Vizer Entities were able to duplicate ADI's planned routes, crew compensation schedules, maintenance reserves, leased aircraft, pilot training costs, aircraft lease rates, and other essential components to operate the Charter Agreement and steal the agreement from ADI.

83.     Because this misappropriation of ADI's trade secrets was carried out by Mr. Markhoff, one of Caesars' Related Persons as defined in the Caesars NDA, and through access to ADI's confidential information obtained by virtue of the Caesars NDA, Caesars is responsible for the breach of the Caesars NDA and for the misappropriation and resulting damages suffered by ADI.

## FIRST CLAIM

## MISAPPRROPRIATION OF TRADE SECRETS

### (Against All Defendants)

84.     ADI incorporates by reference and re-alleges the allegations contained in paragraphs 1 through 83 as if fully set forth herein.

85.     ADI's confidential information alleged herein constitutes a trade secret in that it is a formula, compilation, program, method, technique, system, process, or procedure that derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by the public or any other persons who can obtain commercial or economic value from its disclosure or use and is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.  ADI's trade secrets were not known outside of its business and could not have been properly acquired by Defendants without extreme

FENNEMORE CRAIG
PROFESSIONAL CORPORATION

difficulty, expense, substantial amounts of time, and experience.  As alleged herein, ADI's trade secret information was confidential and meticulously guarded.

86.     On and after January 16, 2015, Defendants misappropriated ADI's trade secrets through the use, disclosure, and nondisclosure of the use of ADI's trade secrets as alleged herein. Defendants acquired ADI's trade secrets by improper means as alleged herein.  Defendants acquired ADI's trade secrets with knowledge of, or reason to know, that the trade secrets were acquired by improper means.

87.     Defendants further misappropriated ADI's trade secrets by, on and after January 16, 2015, disclosing and using the trade secrets without ADI's express or implied consent after using improper means to acquire knowledge of the trade secrets and knew, or had reason to know, that such knowledge was derived from or through a person who had used improper means to acquire them, acquired the trade secrets under circumstances giving rise to a duty to maintain its secrecy and limit its use, and acquired from a person who owed a duty to ADI to maintain its secrecy and limit its use.  Defendants have never returned ADI's trade secret information or advised that it has been destroyed.

88.     Defendants' misappropriation of ADI's trade secrets was wrongful and obtained by improper means because it was obtained in willful breach, or willful inducement of a breach, of express contracts imposing a duty to maintain secrecy as alleged above and by parties with a duty not to disclose.  In addition, Defendants' misappropriation was wrongful and obtained by improper means because it was achieved through misrepresentation, concealment, and deceit as alleged above.

89.     ADI has sustained damages caused by Defendants' misappropriation because, among other things, ADI was wrongfully deprived of the Charter Agreement by Defendants' wrongful acts, Defendants could not have secured the Charter Agreement for themselves without

FENNEMORE CRAIG
PROFESSIONAL CORPORATION

misappropriating and using ADI's trade secrets, Defendants disparaged ADI's business and harmed ADI though unfair and illegal business tactics, Defendants caused third parties to cease or refrain from doing business with ADI, and Defendants stole ADI's customers.

90.     As a result of Defendants' actions, ADI is entitled to an award of lost profits and consequential damages due to the loss of the Charter Agreement, the harm resulting from Defendants' unfair and illegal business tactics, and ADI's loss of customers and business in an amount according to proof at trial but not less than $12,000,000, exclusive of interest and costs.

91.     ADI is also entitled to damages representing the unjust enrichment of Defendants resulting from the benefit conferred upon them through their acts of misappropriation of ADI's trade secrets.

92.     ADI is entitled to an award of punitive and exemplary damages based on Defendants' willful, wanton, and reckless misappropriation and disregard of ADI's rights in its trade secrets.

## SECOND CLAIM

## BREACH OF CONTRACT

### (Against Defendants Caesars And Markhoff)

93.     ADI incorporates by reference and re-alleges the allegations contained in paragraphs 1 through 92 as if fully set forth herein.

94.     As alleged above, on or about October 2, 2014, ADI and Caesars entered into the Caesars NDA which, among other things restricted the use and dissemination of ADI's Confidential Information as defined in the Caesars NDA.  The restrictions of the Caesars NDA extended to Caesars' "officers, partners, directors, employees, accountants, lawyers, advisors and other representatives (collectively 'Related Persons')."  The Caesars NDA provided that Caesars

10622375

FENNEMORE CRAIG
PROFESSIONAL CORPORATION

is "responsible for any acts or omissions of its Related Persons that result in breach of" the Caesars NDA.

95.   ADI performed each of the terms, conditions, and covenants required on its part to be performed under the Agreement, except for those terms, conditions and covenants which were excused, waived and/or discharged.

96.   On and after January 16, 2015, Caesars breached its contractual duties by allowing ADI's Confidential Information to be used by its Related Persons in violation of the Caesars NDA by, among other things, being used by Related Person Mr. Markhoff to interfere with ADI's rights and interests in and to the Charter Agreement, to disparage ADI to its customers and vendors and harm its business, and to disclose ADI's Confidential Information to third parties for purposes of obtaining the Charter Agreement for himself and/or for an entity or entities in which he held an interest, and to steal ADI's customers.

97.   On and after January 16, 2015, Mr. Markhoff breached his contractual duties by using ADI's Confidential Information in violation of the Caesars NDA by, among other things, using it to interfere with ADI's rights and interests in and to the Charter Agreement, to disparage ADI to its customers and vendors and harm its business, to disclose ADI's Confidential Information to third parties for purposes of obtaining the Charter Agreement for himself and/or for an entity or entities in which he held an interest, and to steal ADI's customers.

98.   As a direct and proximate result of the breach by Caesars and Mr. Markhoff of the Caesars NDA, ADI has sustained actual and consequential damages in an amount according to proof at trial but in excess of $12,000,000, exclusive of interest and costs.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### THIRD CLAIM

### BREACH OF CONTRACT

#### (Against Defendants IMS And Markhoff)

99.     ADI incorporates by reference and re-alleges the allegations contained in paragraphs 1 through 98 as if fully set forth herein.

100.     As alleged above, on or about February 7, 2015 ADI and IMS entered into the IMS NDA which, among other things, restricted the use and dissemination of ADI's Confidential Information as defined in the IMS NDA.  The restrictions of the IMS NDA extended to IMS's "officers, directors, partners, members, employees, agents, consultants, affiliates or shareholders (collectively, 'the Receiving Party')."

101.     ADI performed each of the terms, conditions, and covenants required on its part to be performed under the IMS NDA, except for those terms, conditions and covenants which were excused, waived and/or discharged.

102.     IMS and Mr. Markhoff breached their contractual duties by allowing ADI's Confidential Information to be used in violation of the IMS NDA by, among other things, being used by Mr. Markhoff to interfere with ADI's rights and interests in and to the Charter Agreement, to disparage ADI to its customers and vendors and harm its business, to disclose ADI's Confidential Information to third parties for purposes of obtaining the Charter Agreement for himself and/or for an entity or entities in which he held an interest, and to steal ADI's customers.

103.     As a direct and proximate result of the breaches by Mr. Markhoff and IMS, ADI has sustained actual and consequential damages in an amount according to proof at trial but in excess of $12,000,000, exclusive of interest and costs.

FENNEMORE CRAIG
PROFESSIONAL CORPORATION

10622375

## FOURTH CLAIM

## BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

### (Against All Defendants Except The Vizer Entities)

104.     ADI incorporates by reference and re-alleges the allegations contained in paragraphs 1 through 103 as if fully set forth herein.

105.     An implied covenant of good faith and fair dealing exists in every contract and forbids unfair acts by one party that disadvantage the other.

106.     On and after January 16, 2015, Caesars breached its contractual duty of good faith and fair dealing by allowing ADI's Confidential Information to be used by its Related Persons in violation of the Caesars NDA by, among other things, being used by Related Person Mr. Markhoff to interfere with ADI's rights and interests in and to the Charter Agreement, to disparage ADI to its customers and vendors and harm its business, to disclose ADI's Confidential Information to third parties for purposes of obtaining the Charter Agreement for himself and/or for an entity or entities in which he held an interest, and to steal ADI's customers.

107.     Mr. Markhoff breached his contractual duty of good faith and fair dealing by using ADI's Confidential Information in violation of the Caesars NDA and the IMS NDA by, among other things, using it to interfere with ADI's rights and interests in and to the Charter Agreement, to disparage ADI to its customers and vendors and harm its business, to disclose ADI's Confidential Information to third parties for purposes of obtaining the Charter Agreement for himself and/or for an entity or entities in which he held an interest, and to steal ADI's customers.

108.     IMS breached its contractual duty of good faith and fair dealing by allowing ADI's Confidential Information to be used by its Receiving Parties in violation of the IMS NDA by, among other things, being used by Receiving Party Mr. Markhoff to interfere with ADI's rights and interests in and to the Charter Agreement, to disparage ADI to its customers and vendors and

10622375

FENNEMORE CRAIG
PROFESSIONAL CORPORATION

harm its business, to disclose ADI's Confidential Information to third parties for purposes of obtaining the Charter Agreement for himself and/or for an entity or entities in which he held an interest, and to steal ADI's customers.

109.    As a direct and proximate result of the breach the covenant of good faith and fair dealing by Caesars, Mr. Markhoff, and IMS, ADI has sustained actual and consequential damages in an amount according to proof at trial but in excess of $12,000,000, exclusive of interest and costs.

<b><u>PRAYER FOR RELIEF</u></b>

WHEREFORE, Plaintiffs Aerodynamics Incorporated and ADI Holdings Company, Inc. pray for relief against Defendants, as set forth below:

<b><u>ON THE FIRST CAUSE OF ACTION</u></b>

<b>(Against All Defendants)</b>

1.    For damages in an amount according to proof at trial but in excess of $12,000,000, exclusive of interest and costs;

2.    For pre- and post-judgment interest;

3.    For the costs and expenses of suit, including attorney's fees as appropriate;

4.    For an award of punitive and exemplary damages based on Defendants' willful, wanton, and reckless misappropriation and disregard of ADI's rights in its trade secrets; and

5.    For such other and further relief as the Court deems just and proper.

<b><u>ON THE SECOND CAUSE OF ACTION</u></b>

<b>(Against Defendants Caesars and Markhoff)</b>

6.    For damages in an amount according to proof at trial but in excess of $12,000,000, exclusive of interest and costs;

7.    For pre- and post-judgment interest;

10622375

FENNEMORE CRAIG
PROFESSIONAL CORPORATION

8.      For the costs and expenses of suit, including attorney's fees as appropriate; and

9.      For such other and further relief as the Court deems just and proper.

### ON THE THIRD CAUSE OF ACTION

### (Against Defendants IMS And Markhoff)

10.     For damages in an amount according to proof at trial but in excess of $12,000,000, exclusive of interest and costs;

11.     For pre- and post-judgment interest;

12.     For the costs and expenses of suit, including attorney's fees as appropriate; and

13.     For such other and further relief as the Court deems just and proper.

### ON THE FOURTH CAUSE OF ACTION

### (Against All Defendants Except The Vizer Entities)

14.     For damages in an amount according to proof at trial but in excess of $12,000,000, exclusive of interest and costs;

15.     For pre- and post-judgment interest;

16.     For the costs and expenses of suit, including attorney's fees as appropriate; and

17.     For such other and further relief as the Court deems just and proper.

1

2

DATED:  July 15, 2015

3

4                                     _/s/ Anthony W. Austin_
                                      Anthony W. Austin (NV Bar No. 10850)
5                                     FENNEMORE CRAIG, P.C.
                                      2394 East Camelback Road, Suite 600
6                                     Phoenix, Arizona 85016-3429
                                      Telephone:  (602) 916-5343
7                                     Facsimile:  (602) 916-5543
                                      Email:  aaustin@fclaw.com

8                                     C. Dana Hobart (CA Bar No. 125139)
                                        _(Pro Hac Vice Pending)_
9                                     HOBART LINZER LLP
                                      777 S. Figueroa St., Ste. 4000
10                                    Los Angeles, CA 90017
                                      Telephone:  (213) 225-8900
11                                    Facsimile: (213) 225-8929
                                      Email:  dhobart@hobartlinzer.com

12

13                                    _Attorneys for Aerodynamics Incorporated_
                                      _and ADI Holdings Company, Inc._

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## DEMAND FOR JURY TRIAL

2

3      Plaintiff Aerodynamics Incorporated hereby requests a trial by jury.

4      DATED:  July 15, 2015

5

6                                    /s/ Anthony W. Austin
                                    Anthony W. Austin (NV Bar No. 10850)
7                                   FENNEMORE CRAIG, P.C.
                                    2394 East Camelback Road, Suite 600
8                                   Phoenix, Arizona 85016-3429
                                    Telephone:  (602) 916-5343
9                                   Facsimile:  (602) 916-5543
                                    Email:  aaustin@fclaw.com

10                                  C. Dana Hobart (CA Bar No. 125139)
11                                    (Pro Hac Vice Pending)
                                    HOBART LINZER LLP
12                                  777 S. Figueroa St., Ste. 4000
                                    Los Angeles, CA 90017
13                                  Telephone:  (213) 225-8900
                                    Facsimile: (213) 225-8929
14                                  Email:  dhobart@hobartlinzer.com

15                                  *Attorneys for Aerodynamics Incorporated
                                    and ADI Holdings Company, Inc.*

16

17

18

19

20

21

22

23

24

25

26

27

28

10622375

International Management Solutions LLC, Via Airlines, Inc., Via Air LLC, and Amos Vizer,

allege as follows:

## JURISDICTION AND VENUE

1.      Subject matter jurisdiction of this Court is based on 28 U.S.C. § 1332, in that the

action is between a citizen of Nevada and citizens of foreign states and the matter in controversy

exceeds the value of $75,000, exclusive of interest and costs.

2.      Venue is proper in this Court under 28 U.S.C. § 1391 in that a substantial part of

the events or omissions giving rise to Plaintiffs' claims occurred in this judicial district and that

the operative agreements specify that any action or proceeding arising out of such agreements

must be commenced in this judicial district.

## THE PARTIES

3.      Plaintiff Aerodynamics Incorporated, is a Michigan corporation with operations in

Beachwood, Ohio, and Kennesaw, Georgia.

4.      Plaintiff ADI Holdings, Inc. ("Holdings"), is a Georgia corporation with

operations in Kennesaw, Georgia.  Plaintiff Aerodynamics Incorporated was a wholly owned

subsidiary of Holdings and both are referred to herein collectively as "ADI" unless otherwise

indicated.

5.      Defendant Caesars Entertainment Operating Company, Inc. ("Caesars") is a

Delaware corporation with its principal place of business in Clark County, Nevada.

6.      Defendant Steven Markhoff is an individual residing in, and a resident of, Clark

County, Nevada.  Mr. Markhoff is the vice president of ESS Travel Management, a subsidiary of

Caesars.  Mr. Markhoff is also the managing member of defendant International Management

Solutions, LLC.

7.      Defendant International Management Solutions, LLC, ("IMS") is a Delaware limited liability company with its principal place of business in Clark County, Nevada.

8.      Defendant Via Airlines, Inc., formerly known as Charter Air Transport, Inc., is a Colorado corporation with its principal place of business in Maitland, Florida.  Via Airlines, Inc., changed its name from Charter Air Transport, Inc., in or about February 2015.  Via Airlines, Inc., and Charter Air Transport, Inc., are referred to herein collectively as "Via Airlines" unless otherwise indicated.  Via Airlines has transacted business and conducted activities through the trade names Charter Air Transport and Via Air.

9.      Defendant Via Air, LLC, formerly known as Mauiva, LLC, is a Delaware corporation with its principal place of business in Maitland, Florida.  Via Air, LLC changed its name from Mauiva, LLC, in January 2015.  Via Air, LLC, and Mauiva LLC, are referred to herein collectively as "Via Air" unless otherwise indicated.

10.     Defendant Amos Vizer, also known as Ami Vizer, is an individual residing in, and a resident of, Orange County, Florida.  Mr. Vizer is the Chairman of Via Air.  Defendants Via Airlines, Via Air and Ami Vizer are referred to herein collectively as the "Vizer Entities" unless otherwise indicated.

## ALLEGATIONS COMMON TO ALL CLAIMS

### A.      Summary Of Action

11.     ADI was the victim of a scheme by Defendants to obtain ADI's most highly guarded trade secrets, wrongfully misappropriate those trade secrets in violation of nondisclosure agreements, interfere with ADI's contractual expectancy of a three-year charter air service contract with Caesars, and use ADI's trade secrets to obtain the charter air service contract and to interfere with ADI's contractual relations.  All the of the Defendants were fully knowledgeable about the scheme and full participants in carrying it out.  Their conduct constitutes not only

misappropriation of trade secrets, but also breach of nondisclosure agreements, and breach of the duty of good faith and fair dealing.  As alleged herein, ADI is entitled to recovery of compensatory damages in excess of $12 million as well as punitive damages for Defendants' willful misappropriation and disregard of ADI's rights in its trade secrets.

12.     ADI is one of the country's leading full-service aviation service providers. Founded in 1959, ADI has multiple operating bases in the U.S.  ADI is certified as an air carrier pursuant to Federal Aviation Regulation Part 121 giving it regulatory authority to fly as a commuter airline.  ADI operates charter flights using Embraer ERJ 145 regional jets.  ADI has served the industry for 55 years without incident or accident, one of only two companies operating regional jets in the supplemental 121 on-demand regime able to make this claim.

13.     Caesars owns, operates, or manages casinos in five countries on three continents. Within the United States, Caesars owns, operates, or manages casinos in 14 states, primarily under the Caesars, Harrahs, or Horseshoe brand names.  Among Caesars operating units is its ESS Travel Management division.

14.     On October 1, 2014, Scott Beale, then the President, Chief Operating Officer, and owner of ADI (through holding companies), was contacted by Steven Markhoff, Vice President ESS Travel Management for Caesars, who solicited ADI to bid on Caesars' Master Air Transportation Charter Agreement (the "Charter Agreement") to provide charter jet service to bring Caesars patrons to and from Caesars' properties across the United States over a period of three years.

15.     ADI made a bid and, thereafter, Caesars and ADI negotiated the terms of the Charter Agreement.  Had ADI and Caesars entered into the Charter Agreement, ADI's projected revenue over the three year duration was at least $85 million and its profits would have been at least $12 million.

FENNEMORE CRAIG
PROFESSIONAL CORPORATION

16.     ADI and Caesars did not enter into the Caesars Charter Agreement, however. Instead, the Charter Agreement was awarded to an ADI competitor, defendant Via Airlines which is owned and controlled by defendant Ami Vizer.  (June 4, 2015 Caesars/Via Airlines press release, attached hereto as **Exhibit 3**.)  However, Via Airlines was not a Part 121 certified air carrier and had no experience operating jet aircraft, including the Embraer 145 regional jets called for in the Caesars request for proposal.  Thus, Via Airlines was only able to obtain the Charter Agreement by, together with Caesars and Mr. Markhoff, misappropriating ADI's trade secrets and confidential information about ADI's business in general, and its planned operation of the Charter Agreement in particular.

17.     The central figure in the misappropriation of ADI's trade secrets was Caesars' Vice President, Mr. Markhoff.  Between October 2014 and February 2015, ADI shared its most sensitive and confidential business information with Mr. Markhoff and Caesars under a non-disclosure agreement that prohibited the use of ADI's confidential information for any purpose other than evaluating ADI's ability to operate the Charter Agreement.  (October 2, 2014, Caesars nondisclosure agreement ("Caesars NDA"), attached hereto as **Exhibit 1**.)  On and after January 16, 2015, Caesars and Mr. Markhoff breached their nondisclosure obligations and, together with the Vizer, Entities misappropriated ADI's trade secrets, by obtaining ADI's confidential business information to deprive ADI of the Charter Agreement, to enable the Vizer Entities and Mr. Markhoff to obtain the Charter Agreement instead through Via Airlines, and to harm ADI's business and its relationships with its customers and vendors.

**B.     The Initial Relationship Between Caesars And ADI, And The Caesars Non-Disclosure Agreement.**

18.     On October 1, 2014, Mr. Markhoff, as Vice President of Caesars' ESS Travel Management division, contacted Mr. Beale to discuss Caesars' requirements for the Charter Agreement.

10622375

FENNEMORE CRAIG
PROFESSIONAL CORPORATION

19.     While Caesars opened the Charter Agreement bidding to "everyone and their mother," to be eligible to win the Charter Agreement, an operator was required to hold an FAA Part 121 certificate.  Caesars' request for proposal, provided to ADI on or before October 22, 2014, also required that a potential bidder be able to provide at least three and possibly four Embraer ERJ-145 or Canadair CRJ-200 regional jets.

20.     To facilitate the bid process and related negotiations, ADI and Caesars entered into the Caesars NDA effective October 2, 2014.  (Exhibit 1).  The Caesars NDA broadly restricted the use and disclosure of confidential information:

> For the purposes of this Agreement, "Confidential Information" shall mean any and all information or material of a party, whether revealed orally, visually, or in tangible or electronic form, that is not generally known to the public, including, information relating to personnel, employees, consultants and contractors, marketing strategies, sales and marketing data, customer lists (including the identity of actual and potential customers), supplier lists (including the identity of actual and potential suppliers), operations, business procedures, trade secrets, know-how, capabilities, product designs, drawings, specifications, program code, notes, analyses, compilations, studies, forecast, interpretations, or other documents prepared by the Recipient or its representatives that derive from, contain, reflect or are based upon, in whole or in part, the information furnished by the Disclosing Party, and information regarding future technical, business, and marketing plans, and product strategies.  In addition to the foregoing, Confidential Information shall include all information in tangible form and marked "confidential" or with words of similar effect and all information identified as confidential at the time of oral disclosure.

(Caesars NDA, § 3(a).)

21.     The Caesars NDA provided that Caesars was "in a relationship of confidence with respect to the Confidential Information disclosed by ADI."  The restrictions of the Caesars NDA extended to Caesars' "officers, partners, directors, employees, accountants, lawyers, advisors and other representatives (collectively 'Related Persons')."  Importantly, the Caesars NDA provided

that Caesars is "responsible for any acts or omissions of its Related Persons that result in breach of" the Caesars NDA.

22.     The Caesars NDA is to be "governed and construed in accordance with the laws" of Nevada, and any action "arising out of or related to this Agreement shall be commenced in a state or federal court of or in the State of Nevada."  The parties agreed to submit to such jurisdiction and venue "in any such suit, action or proceeding between or among [ADI] or any of its Related Persons and [Caesars] or any of its Related Persons."  The prevailing party in any "litigation or other proceeding" between ADI or its Related Persons and Caesars or its Related Persons may seek reasonable attorneys fees and costs.

C.     **Caesars And ADI Negotiate The Charter Agreement.**

23.     On or about October 9, 2014, Mr. Markhoff traveled to ADI's main offices and operations in Kennesaw, Georgia.  Mr. Markhoff met with Mr. Beale to begin negotiating the Charter Agreement.  During his visit to ADI, Mr. Markhoff reviewed ADI's operational costs and confidential agreements including ADI's confidential Embraer Pool Parts Agreement, its Rolls Royce engine contracts, and its maintenance flow down agreements from its aircraft lessors, Republic Holdings and Cymus Holdings.  ADI also provided Mr. Markhoff with a verification of costs and operating results from its business, including insurance matters, ADI's proprietary maintenance program, and a cost analysis presentation.  In addition, at Mr. Markhoff's request, ADI provided him with a digital thumb drive containing ADI's Federal Aviation Administration-approved manuals and operations specifications.

24.     On or about October 30, 2014, ADI and Caesars met at ADI's Ohio facility to further negotiate the Charter Agreement.  Caesars was represented by Mr. Markhoff, Matthew Levin, who held the title "President's Associate – ESS Travel Management," and Emmanuel Lawrence, who held the title "Category Director, Facilities – Design & Construction for Caesars

FENNEMORE CRAIG
PROFESSIONAL CORPORATION

Strategic Sourcing." ADI was represented by Mr. Beale and other ADI executives. During this visit to ADI, the Caesars employees made an additional review of ADI's confidential and trade secret information including data regarding ADI's costs and operations.

25. Over the course of the Caesars negotiations with ADI, Caesars had access to and reviewed more than 130 separate items of confidential ADI trade secret material.

26. On November 11, 2014, Mr. Markhoff sent Mr. Beale a Preliminary Overview of Proposed Terms For Caesars Entertainment and ADI (the "Deal Sheet"). This Deal Sheet reiterated that "Caesars require[d] 3-4 50 seat regional jets to support its air charter program." Two of the aircraft were to be based in Atlantic City, New Jersey, one in Laughlin, Nevada, and possibly a fourth based in Tunica, Mississippi.

27. On November 17, 2014, Mr. Markhoff wrote to Mr. Beale stating that as "far as we (Caesars) are concerned we are operating on the premise that we have a deal based on the terms in the deal sheet. We are also working on the plan to have you operating the first 2 50 seaters in Atlantic City April 1st." Mr. Markhoff added that once "we get the draft contract agreed to, I need to get our legal department to bless it and take it to our executive committee for final approval – this will be a perfunctory step."

28. On December 1, 2014, Mr. Markhoff provided Mr. Beale with the first draft of the Charter Agreement.

**D.    The Flight Test Aviation Lawsuit And Department Of Transportation Inquiry.**

29. At the outset of the discussions between ADI and Caesars, Mr. Beale informed Caesars that ADI had gone through a Chapter 11 reorganization which it successfully completed in August 2013 and that Mr. Beale had been a defendant in a civil action that arose indirectly from the Chapter 11 reorganization and which had resulted in a judgment against Mr. Beale personally.

10622375

FENNEMORE CRAIG
PROFESSIONAL CORPORATION

30.     Regarding the civil action, during Mr. Markhoff's October 9, 2014, visit to ADI, Mr. Beale informed Mr. Markhoff that a pre-bankruptcy ADI creditor, Flight Test Aviation, was unable to recover satisfactory funds from ADI through the bankruptcy process and, as a result, sued Mr. Beale personally alleging that Mr. Beale was responsible for Flight Test Aviation's investment losses.  Mr. Beale told Mr. Markhoff that Flight Test Aviation had invested $500,000 in ADI and sued Mr. Beale based on alleged representations that a contract was in place with a third party to support charter flights.  At trial, Mr. Beale presented evidence that he never made any representations that a contract was in place, only that such a contract was being negotiated. Nevertheless, a jury found Mr. Beale liable to Flight Test Aviation for civil fraud and awarded damages of $600,000.

31.     At the later meeting at ADI's Ohio facility on October 30, 2014, Mr. Beale and Mr. Markhoff further discussed the Flight Test Aviation matter.  Mr. Markhoff told Mr. Beale in this conversation that Caesars was not concerned about the Flight Test Aviation matter because it was a civil action involving Mr. Beale as an individual and because there are two sides to every story.

32.     ADI and Mr. Beale also disclosed the Flight Test Aviation lawsuit in answer to Caesars' business information questionnaire asking whether ADI or its principals had "ever been named as a defendant in litigation alleging fraud, deceit or similar claims."  Caesars uses this questionnaire as part of  its efforts to conduct background investigations of potential contracting parties which Mr. Markhoff described as being very exhaustive due to gaming business requirements.

33.     Mr. Beale further informed Mr. Markhoff that ADI had disclosed the Flight Test Aviation lawsuit to the Department of Transportation ("DOT") on June 25, 2014, in connection with ADI's application to obtain a certificate to operate flights between Youngstown-Warren

Regional Airport and Chicago O'Hare International Airport and that, while processing ADI's application, the DOT had begun a review of ADI's fitness to conduct operations.

**E.      Caesars And ADI Reach Agreement On The Charter Agreement.**

34.      Being fully informed of ADI's bankruptcy, Mr. Beale's civil judgment, and the pending DOT application for scheduled authority, Caesars encouraged ADI to bid on the Charter Agreement and, thereafter, the parties negotiated the terms of the Charter Agreement.

35.      Throughout the Charter Agreement negotiations, Mr. Beale regularly updated Mr. Markhoff of the status of the DOT inquiry.  For instance, on December 11, 2014, while providing ADI's comments on the first draft of the Charter Agreement, Mr. Beale wrote to Mr. Markhoff stating that "our DOT scheduled authority remains pending.  We will have before we start the agreement but want to make sure you are aware."

36.      Five days later, on December 17, under the subject line "Good News," Mr. Markhoff emailed Mr. Beale and said it "looks like we will take your bid for the charter, we will get the signed quote back to you shortly."  Later that same day, Mr. Markhoff wrote to Mr. Beale stating that Caesars "would like to wrap this up as soon as possible."  On December 27, Mr. Markhoff wrote to Mr. Beale stating that "[w]e are fine with the latest changes [to the draft Charter Agreement and] . . .  am sending to our legal department for final review."  Neither Mr. Beale's civil judgment nor the DOT inquiry was raised by Caesars as posing any impediment to ADI and Caesars entering into the Charter Agreement.  In fact, in early January 2015, Mr. Markhoff reported to Mr. Beale that Mr. Beale and ADI had passed Caesars' background investigation.

37.      As of January 12, 2015, Caesars' legal department had reviewed and approved the Charter Agreement with minor revisions.  The Caesars legal department raised no issue regarding

the civil judgment or the DOT inquiry.  By January 21, 2015, it appeared that Caesars and ADI had agreed upon a final version of the agreement.

**F.    The DOT's Order To Show Cause And ADI's Immediate Remedial Action.**

38.    As alleged above, the DOT's inquiry emanated from ADI's application for an interstate scheduled certificate to operate round trip flights between Youngstown-Warren Regional Airport and Chicago O'Hare International Airport.  As part of its application, ADI identified the Flight Test Aviation lawsuit and, during the pendency of the ADI's application, the DOT became aware of the civil judgment.

39.    On January 22, 2015, the DOT issued an Order to Show Cause ("OSC") proposing to deny ADI's application for interstate scheduled passenger authority.  The OSC also tentatively proposed to revoke ADI's certificates for interstate and foreign air charter transportation.  Mr. Beale emailed Mr. Markhoff a copy of the OSC that same day.

40.    The OSC was primarily based on Mr. Beale's civil judgment and ADI's alleged failure to bring it to the DOT's attention more quickly.  The DOT tentatively concluded that Mr. Beale's roles at ADI raised questions as to ADI's compliance disposition and managerial competency.

41.    ADI took immediate actions to resolve the DOT's concerns, reestablish ADI's fitness to operate as a scheduled carrier, and prevent any adverse action from being taken regarding ADI's certificates.  Effective January 26, 2015, Mr. Beale stepped down as CEO, President, and Chairman of the Board of ADI and its parent companies.  Darrell Richardson was named as Mr. Beale's successor, other new senior management was appointed, and three new board members were appointed to the boards of ADI and its parent companies.  Mr. Beale also committed to sell his interest in ADI over a relatively short period of time.

42.     On February 5, 2012, ADI informed the DOT of these steps and Mr. Markhoff was informed as well.  Satisfied with the prompt and comprehensive action taken by ADI, on February 13, 2015, the DOT wrote to ADI and stated that "based on the information provided by ADI, it is the Department's intention to defer further action within the timeframe ADI has requested."  Mr. Markhoff was immediately informed of the DOT's position.  (Later, on March 26, 2015, ADI's regulatory counsel reconfirmed to Caesars that ADI had taken these steps and reaffirmed that ADI continued "to possess its full DOT and FAA authority to provide charters to Caesars.")

43.     As of the date of the filing of this complaint, ADI possesses all certificates to conduct interstate and foreign charter air transportation and the DOT has taken no further action regarding the OSC.

**G.     Caesars Conducts Further Review Of ADI's Trade Secret Information.**

44.     Even though Caesars was fully aware of the DOT inquiry and moved forward enthusiastically to finalize the Charter Agreement with ADI, when Caesars received the OSC, Mr. Markhoff informed Mr. Beale that Caesars wanted to conduct additional due diligence and provided Mr. Beale with a Due Diligence Checklist for a broad review of ADI's corporate, operational and legal documentation.  Nevertheless, Mr. Markhoff told Mr. Beale on January 22, 2015, that Caesars was supportive of ADI, believed ADI had a solid plan, and had faith in ADI's experienced management team.  He also added that, paradoxically, the DOT action denying ADI's interstate scheduled passenger certificate was good for Caesars because it would make ADI more attentive to Caesars.

45.     ADI fully cooperated with Caesars' request for additional due diligence.  On January 26, 2015, ADI provided Caesars with access to a digital, password-protected, document library containing historical and current financial statements and pro formas, operations manuals,

FENNEMORE CRAIG
PROFESSIONAL CORPORATION

policy manuals, specific operating data, business plan and budgets both for the Caesars Charter Agreement as well as the rest of the ADI, vendor contracts, leases, service agreements, customer lists, and customer contracts.  On January 27, 2015, Mr. Markhoff told Darrell Richardson, who by then was ADI's Chairman, President and CEO, that he had downloaded all of ADI's documents from the digital document library.

46.     Then, on January 27, 2015, Mr. Markhoff and Matt Levin of Caesars arrived at ADI's Ohio facility and, as Mr. Markhoff had requested, ADI gave them complete access to all of ADI's confidential and proprietary information including business plans, contracts, leases, pricing models, customer lists, all financial records, all customer lists, contact information for ADI's lessors, proprietary and special agreements with key suppliers, and profit margin information on the business.  The ADI and Caesars personnel also reviewed and discussed together every document that ADI had posted in the digital document library.

47.     One of the most competitively sensitive items of ADI's confidential information that was shared with Caesars (and subsequently misappropriated by Defendants) was a detailed Excel financial model containing all of ADI's proprietary projections and data regarding how it would operate the Charter Agreement.  This model included highly proprietary information about ADI's projected profit and losses on all of its routes in general and, with respect to the Caesars Charter Agreement in particular, contained projected income on the Caesars routes, crew compensation, maintenance reserves, pilot training costs, aircraft lease rates, and many other categories of data that ADI never shares outside of the company.  This confidential, trade secret model constitutes a roadmap to operating the Embraer 145 50-seat regional jets under the Charter Agreement, was developed at great expense to ADI, and would be immeasurably valuable to Mr. Markhoff and Mr. Vizer.  Mr. Vizer's only experience was operating propeller-driven airplanes

which carry no more than 30 passengers.  Mr. Markhoff has not had experience with regional jets

for over 10 years and, even then, his connection to regional jets was as legal counsel.

### H.    The Fraudulent Offer To Purchase ADI.

48.    Even though he was a Caesars employee purportedly working to advance the

Charter Agreement between Caesars and ADI, during Mr. Markhoff's January 27, 2015 visit to

ADI, Mr. Markhoff told Mr. Beale, in the presence of Caesars' Mr. Levin, that Mr. Markhoff

himself would be interested in purchasing ADI.  Mr. Markhoff had also told Mr. Beale before

arriving that he had met several times with his boss at Caesars, that his boss was aware of Mr.

Markhoff's plans, and had approved them.

49.    During Mr. Markhoff's and Mr. Levin's visit to ADI on January 27, 2015, Mr.

Levin prepared a highly detailed analysis and budget proforma for the acquisition of ADI.  Mr.

Levin's analysis determined the profitability of ADI and what an acquirer could pay Mr. Beale

based on monthly cashflow to purchase his ownership in ADI.

50.    On February 7, Mr. Markhoff, on behalf of defendant International Management

Solutions, LLC ("IMS"), an entity Mr. Markhoff told Mr. Beale he owned or controlled, entered

into a letter of intent with ADI's parent company, Holdings, to purchase Holdings.  (2/7/16 Letter

of Intent (the "LOI"), attached hereto as **Exhibit 2** (Exhibit A omitted).)

51.    The LOI had a binding confidentiality provision:

> The term "Confidential Information" as used in this Agreement
> shall mean all information, including financial information,
> projections, costs, customers and contracts, data, knowledge, and
> know-how (in whatever form and however communicated) relating,
> directly or indirectly, to a party (or to its affiliates or to its or their
> businesses, operations, properties, products, markets, or financial
> positions) that is delivered or disclosed by such party or any of its
> officers, directors, partners, members, employees, agents, affiliates,
> or shareholders (collectively, the Disclosing Party") to the other
> party or any of its officers, directors, partners, members, employees,
> agents, consultants, affiliates or shareholders (collectively, "the
> Receiving Party") in writing, electronically or through visual

means, or which the Receiving Party learns or obtains through observation or through analyses, interpretations, compilations, studies, or evaluations of such information, data, knowledge, or know-how. The burden is on the Receiving Party of proving that any information, data, knowledge, or know-how is not "Confidential Information."

(Id., § 7 (hereafter the "IMS NDA").)  The LOI provided that such confidential information "shall be used by Buyer for performing its due diligence of the Company and shall not be disclosed to any third party other than Buyer's affiliates, assigns, successors, investors, accountants, lawyers and advisors."  (Id.)  Although IMS was permitted to disclose ADI confidential information to its "affiliates, investors and professional advisors," IMS "accept[ed] responsibility for their compliance."  (Id.)  The LOI required ADI to "provide Buyer and its Representatives reasonable access during normal business hours to ADI's facilities, books and records, and provided that Holdings will cause ADI's Representatives to cooperate fully with Buyer and its Representatives in connection with such due diligence investigation."  (Id., § 8.)  "Representatives" was defined as IMS's "members, officers, directors, advisors and agents."  The LOI provided that it is to be "governed and construed in accordance with the laws of the State of Nevada" and that the parties agreed "to the exclusive jurisdiction of the State of Nevada."  (Id., § 9(d).)

## I.   Defendants' Misappropriation Of ADI's Trade Secrets.

### 1.   Mr. Markhoff Misrepresents The Purpose Of His Visit To ADI's Aircraft Lessor Republic Airlines.

52.     Upon executing the LOI, Mr. Markhoff and Mr. Beale discussed the terms of a sale of ADI.  Mr. Markhoff requested that he be authorized to "discuss the status of your Republic aircraft leases with Republic Airlines in furtherance of our due diligence to acquire ADI."  Republic Airlines, a subsidiary of Republic Airways Holdings, was the lessor of four Embraer 145 regional jets to ADI.  On February 9, 2015, Mr. Richardson gave Mr. Markhoff authorization to discuss ADI's aircraft leases with Republic.  Because Caesars was fully aware and approved of

Mr. Markhoff's intentions, Mr. Markhoff acknowledged this authorization by replying using his Caesars' email and under his Caesars title, Vice President ESS Travel Management.

53.    Mr. Markhoff's representation to ADI that his purpose in meeting with Republic was to further due diligence to acquire ADI was false and intended to mislead ADI.  Instead, Mr. Markhoff's true purpose was to obtain secret details of Republic's lease program with ADI for use in replacing ADI with an entity owned and/or controlled by Mr. Markhoff and/or the Vizer Entities.

54.    Because ADI was providing access to its confidential information to Caesars, Mr. Markhoff, and IMS's "affiliates, investors and professional advisors," and also was allowing unsupervised discussions between Mr. Markhoff and ADI's airplane lessor, Republic, Mr. Beale became concerned when Mr. Markhoff unexpectedly asked him what he thought of defendant Ami Vizer.  Mr. Beale replied that he didn't think much of Mr. Vizer as he is ADI's competitor. Then, concerned that Mr. Markhoff had asked the question because Mr. Markhoff's investors might include Mr. Vizer and/or his companies, Mr. Beale directly said to Mr. Markhoff "you aren't working with him, are you?" to which Mr. Markhoff falsely responded, "no way, I am not working with Ami."  Mr. Markhoff wrote in an email to Mr. Beale, that "my partners in this are strategic and they are equity investors."

### 2.    Ami Vizer And The Vizer Entities.

55.    It turns out that, unbeknownst to Mr. Beale or anyone at ADI, Mr. Markhoff was indeed working with Mr. Vizer in order to misappropriate ADI's trade secrets so that one of the Vizer Entities (together with Mr. Markhoff) could obtain the Charter Agreement instead of ADI, steal ADI's customers, and interfere with ADI's contracts with its vendors and lessors.

56.    Mr. Vizer owns or controls the Vizer Entities.  All of the Vizer Entities operate from the same address in Maitland, Florida.  Mr. Vizer is Chairman of Via Air and his wife, Irit Vizer, is president and CEO.

57.    According to its website, Via Air is an "indirect air carrier operating under DOT Regulation 14 CFR 380 together with its subsidiary, Charter Air Transport, d.b.a. Via Airlines ('Via Airlines'), as the Direct Air Carrier on 30 EMB-120 aircraft."  According to DOT records, Via Airlines operated as a direct air carrier on behalf of its sister company Via Air.

58.    From 2012 through at least 2014, the Vizer Entities operated more than 400 flights into and out of McCarran International Airport in Las Vegas, Nevada.

59.    In addition to operating flights to and from Nevada, Mr. Vizer has, on behalf of the Vizer Entities, negotiated contracts with Nevada corporations by telephone, email, and in person, specifically including contracts with Caesars or its subsidiaries or divisions.  According to the press release dated June 4, 2015, jointly issued by Caesars and Via Airlines, Via Airlines "has been operating flights for Caesars since 1997."  (Exhibit 3.)

**3.    Defendants' Fraudulent Access To ADI's Trade Secrets And Breach Of The Nondisclosure Agreements.**

**a.    Defendants' Visits To Republic.**

60.    Based on ADI's authorization, which Mr. Markhoff obtained though his fraudulent statements to ADI, Mr. Markhoff met in person with representatives of Republic Holdings (without any ADI personnel present) in Indianapolis, Indiana, and breached his duties of non-disclosure under the Caesars NDA and the IMS NDA.  In a meeting on or about February 9, 2015, attended by Republic's CEO and other Republic executives, Mr. Markhoff disparaged ADI by using the results of the confidential information he had been given by ADI, disclosed to Republic all of his findings regarding ADI, its contracts, its financial status, and falsely said that "ADI is bankrupt."

10622375

FENNEMORE CRAIG
PROFESSIONAL CORPORATION

61.     On or about February 17, 2015, Mr. Markhoff made a second visit to Republic, this time accompanied by Mr. Vizer.  Mr. Vizer's presence at this meeting with Republic was concealed from ADI.  During this meeting, in further breach of Defendants' duties of non-disclosure under the Caesars NDA and the IMS NDA, Mr. Markhoff disclosed significant amounts of ADI's confidential information to the Republic executives and to Mr. Vizer.  Furthermore, both Mr. Markhoff and Mr. Vizer said in this meeting that they would be taking the business from ADI (which they could only do by misappropriating ADI's trade secrets), discussed the proprietary terms of the ADI/Republic aircraft contracts, and said that they intended to step into the shoes of ADI on ADI's aircraft leases with Republic.

**b.  Fraudulent Access To ADI's Trade Secrets By The Vizer Entities' Financial Director.**

62.     Separately, Mr. Markhoff and Mr. Vizer misled ADI into permitting one of Mr. Vizer's executives to visit ADI's Ohio facility for two days and have unfettered access to ADI's confidential trade secret information by falsely representing that the executive was an independent accountant when in reality she was an executive of the Vizer Entities.

63.     On February 11, 2015, Mr. Markhoff represented to Mr. Beale that an independent accounting consultant whom he identified only as "Marina" would visit ADI's Ohio office on February 12, 2015, to perform an accounting audit in connection with the possible purchase of ADI.  Mr. Markhoff wrote to Mr. Beale that Mr. Markhoff's "partners want to see the results of her review before addressing the offer."  No other information about Marina was given to ADI prior to her visit.

64.     ADI later discovered that "Marina" was not an independent accounting consultant as Mr. Markhoff had represented, but rather was Marina Morgan, Financial Director of Mr. Vizer's company, Via Air.

FENNEMORE CRAIG
PROFESSIONAL CORPORATION

65.     In advance of Marina's visit, ADI informed Mr. Markhoff that she would be strictly limited to reviewing, but not copying, ADI's trade secret information.  When Marina arrived at ADI on February 12, 2015, she refused to answer any questions about her identity posed by ADI employees, did not identify herself other than as "Marina," did not disclose for whom she worked, and concealed the true purpose of her visit.  She requested that ADI give her a list of all its customers, identify the customer representatives, provide a copy of each customer contract, and provide details about those customers.  She also asked to take with her ADI's digital QuickBooks financial database.  These requests appeared to ADI to be unrelated to Mr. Markhoff's possible acquisition of ADI and ADI employees grew suspicious of Marina's true purpose in being at ADI.  When questioned by Mr. Beale, Mr. Markhoff said that ADI was required to cooperate and falsely represented that the purpose of accessing ADI's confidential and proprietary customer information was so that Mr. Markhoff could evaluate ADI's quality of earnings in connection with the acquisition.

66.     Shortly after she arrived the next morning, Marina was discovered taking photographs of ADI's confidential documents which ADI had expressly prohibited.  After making that discovery, ADI told Marina to leave.

67.     The concealment and misrepresentation of Marina's true affiliation, the true purpose of her review of ADI's confidential information, and her access to ADI's trade secret information, were further breaches of Mr. Markhoff's and Caesars' duties of non-disclosure under the Caesars NDA and the IMS NDA as well as a misappropriation of ADI's trade secrets by the Vizer Entities.

### c.  Caesars' Pretextual Termination Of Negotiations With ADI.

68.     Only hours after Marina was told to leave ADI, on February 13, 2015, Mr. Markhoff sent Mr. Beale an email on behalf of IMS "terminating our diligence and our interest in

acquiring the company."  The following Monday, February 16, 2015, now on behalf of Caesars, Mr. Markhoff wrote to Mr. Richardson stating that "Caesars has elected to no longer pursue a contract with ADI to operate aircraft for the Caesars air network."

### 4.     Defendant's Further Acts Of Misappropriation.

69.     Though unknown to ADI at the time, it became clear in meetings on or about February 17 and 18, 2015, between Mr. Markhoff, Mr. Vizer, and Republic employees at Republic's headquarters in Indianapolis that the true intent of Caesars, Mr. Markhoff, and Mr. Vizer was to misappropriate ADI's trade secrets, steal ADI's business, and use the purported plan to purchase ADI as a fraudulent cover to carry this out.  At this meeting, Mr. Markhoff stated to the assembled group that he was going to be resigning from Caesars to join the Vizer Entities, run the companies, and become an equity investor of the Vizer Entities.  Mr. Markhoff stated that he intended to take all of ADI's business and that ADI would be out of business in the very near future.  Mr. Markhoff further stated that he, Caesars, and IMS never had an intention to buy ADI, but rather, from the outset of the sham sale process, Mr. Markhoff and Mr. Vizer always intended that the two would be partners and take ADI's business and the Caesars Charter Agreement.  Mr. Markhoff said at the meeting, "I never planned to acquire ADI but I do plan to steal ADI's business and put them out of business."  Mr. Vizer confirmed these facts in the same meeting.

70.     Mr. Markhoff's bold statements caused Republic's CEO to become concerned whether Caesars was aware of Mr. Markhoff's actions.  Accordingly, following the meeting alleged in the preceding paragraph, Republic's CEO called the president of Caesars who confirmed that Mr. Markhoff's actions were indeed known to, and approved of, at the highest executive levels of Caesars.

71.     Following the meeting at Republic, Republic provided Mr. Markhoff with a term sheet for the Vizer Entities to lease nine aircraft from Republic.  Thereafter, Mr. Markhoff sent

10622375

FENNEMORE CRAIG
PROFESSIONAL CORPORATION

redline comments back to Republic which Republic recognized to be the same terms as the ADI leases with Republic.  Republic informed Mr. Markhoff that Republic was not going to duplicate ADI's lease terms for the Vizer Entities.

72.     In further breach of Mr. Markhoff's and Caesars' duties of non-disclosure under the Caesars NDA and the IMS NDA, in the February to March 2015 time frame, Mr. Markhoff contacted ADI's customers and vendors in an effort to interfere with ADI's customers and steal ADI's business.

73.     Among the most damaging acts of interfering with ADI's customer relationships was Markhoff's interference with the contractual relationship between ADI and PASS Charters, Inc.  ADI and PASS had entered into a one year Aircraft Dry Lease Agreement on September 19, 2014 under which ADI leased aircraft (including crew, maintenance, and insurance) to PASS for the operation by ADI of flights to transport PASS's customers via on demand charter flights. PASS is not a direct or indirect air carrier and does not own or operate any aircraft; rather all of PASS's chartered flights are operated by certificated air carriers like ADI who maintain full operational control of charter flights at all times.

74.     During a portion of the February 17-18, 2015, meeting at Republic alleged above, PASS's president, Sue Pavlak, participated by telephone.  During the portion of the meeting attended by Ms. Pavlak, Mr. Markhoff confirmed that the Vizer Entities would support all PASS requirements for regional jet aircraft and replace ADI and the agreement that was in place.  Mr. Markhoff also stated that the Vizer Entities would be less expensive than ADI because, based on Mr. Markhoff's extensive review of ADI's confidential financial and operational records, Mr. Markhoff concluded that ADI did not know how to control costs.

75.     On or about February 19, 2015, Mr. Markhoff and Ms. Pavlak met in Las Vegas to further discuss Mr. Markhoff's plan to interfere with ADI's contract with PASS and conclude a

FENNEMORE CRAIG
PROFESSIONAL CORPORATION

commitment with PASS that the Vizer Entities would operate the regional jet portion of PASS's charter business.  Subsequently, Ms. Pavlak and the owner of PASS, William Larkin, traveled to the Vizer Entities' offices in Florida to conclude the transaction.

76.     Not coincidentally, on March 2, 2015, PASS purported to terminate its contract with ADI.  Despite PASS not having the contractual right to terminate the ADI contract, PASS nevertheless did so and used, as a pretext, the assertion that PASS's clients refused to use ADI's aircraft.  While such an assertion was not a lawful basis to terminate and constituted a breach of the ADI/PASS contract, PASS later booked several flights with ADI for the same PASS clients, belying its claimed basis for termination.  The breach by PASS, brought about and facilitated by Defendants' misappropriation of ADI's trade secrets, has caused ADI to lose at least $1,000,000 in revenue.  Consequently, ADI has been damaged by Defendants' acts due to the loss of the PASS contract and its associated profit.

77.     More recently, Via Airlines certified an Embraer 145 for Federal Aviation Regulations, Part 135, operations.  Via Airlines flew the aircraft to demonstrate its capabilities to nine National Collegiate Athletic Association colleges that were ADI customers, and whose names Defendants learned by misappropriating ADI's trade secrets, in an attempt to steal ADI's customers.  These colleges represent sales by ADI of approximately $750,000 per college.

78.     Mr. Markhoff further misappropriated ADI's trade secrets by contacting ADI's other aircraft lessor, Cymus, and requesting a term sheet to lease the two aircraft that Cymus was already leasing to ADI.  Mr. Markhoff would have been unable to know ADI's aircraft lessor or the specific aircraft involved without having access to ADI's trade secrets and breaching the Caesars NDA and the IMS NDA.

79.     Mr. Markhoff further misappropriated ADI's trade secrets by contacting aircraft manufacturer, Embraer, and disclosing to Embraer that he had access to and/or a copy of ADI's

Pool Parts Agreement with Embraer.  The Embraer Pool Parts Agreement is a highly negotiated support contract whereby ADI is given access to airframe and other parts, in addition to engineering and other support functions, in exchange payment to Embraer based on hours of aircraft operation.  ADI's Pool Parts Agreement was particularly valuable because ADI collaborated with its lessor, Republic, to take advantage of Republic's own Pool Parts Agreement which covers several hundred Embraer Aircraft.

80.     On May 28, 2015, the Vice President, Sales & Business Development, for Embraer Aircraft Customer Services, Inc., wrote to Mr. Richardson of ADI stating that Embraer was engaged in negotiations with another operator which might soon operate a number of Embraer regional jets into Las Vegas for a "local entertainment company."   Embraer's Vice President wrote that, "much to our surprise and displeasure, we are let [sic] to believe that they have access to a copy of the Embraer - ADI exchange Pool agreement.  This could never be such, as our non-disclosure agreement would not allow ADI to release such document or disclose its content to a 3rd party."  ADI later learned that Embraer was negotiating with Mr. Markhoff.  Mr. Markhoff would have been unable to have access to the Embraer Pool Parts Agreement without having had access to ADI's trade secrets, breaching the Caesars NDA and the IMS NDA, and misappropriating the secret Embraer Pool Parts Agreement.

**J.     Defendants Complete The Misappropriation Of ADI's Trade Secrets And Caesars Awards The Charter Agreement to Charter Airlines.**

81.     On June 4, 2015, Caesars and Via Airlines jointly issued a press release publicly announcing that they had entered into a long-term agreement under which Via Airlines would provide flights on behalf of Caesars.  (Exhibit  3.)  In the joint press release, Via Airlines stated that it would operate the Charter Agreement through its "fleet of owned and leased Embraer jets." (Id.)

10622375

82.    Mr. Markhoff and the Vizer Entities misappropriated ADI's trade secrets in obtaining the Charter Agreement by using ADI's confidential information to construct a jet charter operation where neither had any material experience in such an operation.  By misappropriating ADI's confidential information, Mr. Markhoff and the Vizer Entities were able to duplicate ADI's planned routes, crew compensation schedules, maintenance reserves, leased aircraft, pilot training costs, aircraft lease rates, and other essential components to operate the Charter Agreement and steal the agreement from ADI.

83.    Because this misappropriation of ADI's trade secrets was carried out by Mr. Markhoff, one of Caesars' Related Persons as defined in the Caesars NDA, and through access to ADI's confidential information obtained by virtue of the Caesars NDA, Caesars is responsible for the breach of the Caesars NDA and for the misappropriation and resulting damages suffered by ADI.

### FIRST CLAIM

### MISAPPRROPRIATION OF TRADE SECRETS

#### (Against All Defendants)

84.    ADI incorporates by reference and re-alleges the allegations contained in paragraphs 1 through 83 as if fully set forth herein.

85.    ADI's confidential information alleged herein constitutes a trade secret in that it is a formula, compilation, program, method, technique, system, process, or procedure that derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by the public or any other persons who can obtain commercial or economic value from its disclosure or use and is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.  ADI's trade secrets were not known outside of its business and could not have been properly acquired by Defendants without extreme

difficulty, expense, substantial amounts of time, and experience.  As alleged herein, ADI's trade secret information was confidential and meticulously guarded.

86.    On and after January 16, 2015, Defendants misappropriated ADI's trade secrets through the use, disclosure, and nondisclosure of the use of ADI's trade secrets as alleged herein. Defendants acquired ADI's trade secrets by improper means as alleged herein.  Defendants acquired ADI's trade secrets with knowledge of, or reason to know, that the trade secrets were acquired by improper means.

87.    Defendants further misappropriated ADI's trade secrets by, on and after January 16, 2015, disclosing and using the trade secrets without ADI's express or implied consent after using improper means to acquire knowledge of the trade secrets and knew, or had reason to know, that such knowledge was derived from or through a person who had used improper means to acquire them, acquired the trade secrets under circumstances giving rise to a duty to maintain its secrecy and limit its use, and acquired from a person who owed a duty to ADI to maintain its secrecy and limit its use.  Defendants have never returned ADI's trade secret information or advised that it has been destroyed.

88.    Defendants' misappropriation of ADI's trade secrets was wrongful and obtained by improper means because it was obtained in willful breach, or willful inducement of a breach, of express contracts imposing a duty to maintain secrecy as alleged above and by parties with a duty not to disclose.  In addition, Defendants' misappropriation was wrongful and obtained by improper means because it was achieved through misrepresentation, concealment, and deceit as alleged above.

89.    ADI has sustained damages caused by Defendants' misappropriation because, among other things, ADI was wrongfully deprived of the Charter Agreement by Defendants' wrongful acts, Defendants could not have secured the Charter Agreement for themselves without

FENNEMORE CRAIG
PROFESSIONAL CORPORATION

misappropriating and using ADI's trade secrets, Defendants disparaged ADI's business and harmed ADI though unfair and illegal business tactics, Defendants caused third parties to cease or refrain from doing business with ADI, and Defendants stole ADI's customers.

90.     As a result of Defendants' actions, ADI is entitled to an award of lost profits and consequential damages due to the loss of the Charter Agreement, the harm resulting from Defendants' unfair and illegal business tactics, and ADI's loss of customers and business in an amount according to proof at trial but not less than $12,000,000, exclusive of interest and costs.

91.     ADI is also entitled to damages representing the unjust enrichment of Defendants resulting from the benefit conferred upon them through their acts of misappropriation of ADI's trade secrets.

92.     ADI is entitled to an award of punitive and exemplary damages based on Defendants' willful, wanton, and reckless misappropriation and disregard of ADI's rights in its trade secrets.

## SECOND CLAIM

## BREACH OF CONTRACT

### (Against Defendants Caesars And Markhoff)

93.     ADI incorporates by reference and re-alleges the allegations contained in paragraphs 1 through 92 as if fully set forth herein.

94.     As alleged above, on or about October 2, 2014, ADI and Caesars entered into the Caesars NDA which, among other things restricted the use and dissemination of ADI's Confidential Information as defined in the Caesars NDA.  The restrictions of the Caesars NDA extended to Caesars' "officers, partners, directors, employees, accountants, lawyers, advisors and other representatives (collectively 'Related Persons')."  The Caesars NDA provided that Caesars

10622375

FENNEMORE CRAIG
PROFESSIONAL CORPORATION

is "responsible for any acts or omissions of its Related Persons that result in breach of" the Caesars NDA.

95.    ADI performed each of the terms, conditions, and covenants required on its part to be performed under the Agreement, except for those terms, conditions and covenants which were excused, waived and/or discharged.

96.    On and after January 16, 2015, Caesars breached its contractual duties by allowing ADI's Confidential Information to be used by its Related Persons in violation of the Caesars NDA by, among other things, being used by Related Person Mr. Markhoff to interfere with ADI's rights and interests in and to the Charter Agreement, to disparage ADI to its customers and vendors and harm its business, and to disclose ADI's Confidential Information to third parties for purposes of obtaining the Charter Agreement for himself and/or for an entity or entities in which he held an interest, and to steal ADI's customers.

97.    On and after January 16, 2015, Mr. Markhoff breached his contractual duties by using ADI's Confidential Information in violation of the Caesars NDA by, among other things, using it to interfere with ADI's rights and interests in and to the Charter Agreement, to disparage ADI to its customers and vendors and harm its business, to disclose ADI's Confidential Information to third parties for purposes of obtaining the Charter Agreement for himself and/or for an entity or entities in which he held an interest, and to steal ADI's customers.

98.    As a direct and proximate result of the breach by Caesars and Mr. Markhoff of the Caesars NDA, ADI has sustained actual and consequential damages in an amount according to proof at trial but in excess of $12,000,000, exclusive of interest and costs.

### THIRD CLAIM

### BREACH OF CONTRACT

### (Against Defendants IMS And Markhoff)

99.     ADI incorporates by reference and re-alleges the allegations contained in paragraphs 1 through 98 as if fully set forth herein.

100.     As alleged above, on or about February 7, 2015 ADI and IMS entered into the IMS NDA which, among other things, restricted the use and dissemination of ADI's Confidential Information as defined in the IMS NDA.  The restrictions of the IMS NDA extended to IMS's "officers, directors, partners, members, employees, agents, consultants, affiliates or shareholders (collectively, 'the Receiving Party')."

101.     ADI performed each of the terms, conditions, and covenants required on its part to be performed under the IMS NDA, except for those terms, conditions and covenants which were excused, waived and/or discharged.

102.     IMS and Mr. Markhoff breached their contractual duties by allowing ADI's Confidential Information to be used in violation of the IMS NDA by, among other things, being used by Mr. Markhoff to interfere with ADI's rights and interests in and to the Charter Agreement, to disparage ADI to its customers and vendors and harm its business, to disclose ADI's Confidential Information to third parties for purposes of obtaining the Charter Agreement for himself and/or for an entity or entities in which he held an interest, and to steal ADI's customers.

103.     As a direct and proximate result of the breaches by Mr. Markhoff and IMS, ADI has sustained actual and consequential damages in an amount according to proof at trial but in excess of $12,000,000, exclusive of interest and costs.

10622375

FENNEMORE CRAIG
PROFESSIONAL CORPORATION

## FOURTH CLAIM

## BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

### (Against All Defendants Except The Vizer Entities)

104.    ADI incorporates by reference and re-alleges the allegations contained in paragraphs 1 through 103 as if fully set forth herein.

105.    An implied covenant of good faith and fair dealing exists in every contract and forbids unfair acts by one party that disadvantage the other.

106.    On and after January 16, 2015, Caesars breached its contractual duty of good faith and fair dealing by allowing ADI's Confidential Information to be used by its Related Persons in violation of the Caesars NDA by, among other things, being used by Related Person Mr. Markhoff to interfere with ADI's rights and interests in and to the Charter Agreement, to disparage ADI to its customers and vendors and harm its business, to disclose ADI's Confidential Information to third parties for purposes of obtaining the Charter Agreement for himself and/or for an entity or entities in which he held an interest, and to steal ADI's customers.

107.    Mr. Markhoff breached his contractual duty of good faith and fair dealing by using ADI's Confidential Information in violation of the Caesars NDA and the IMS NDA by, among other things, using it to interfere with ADI's rights and interests in and to the Charter Agreement, to disparage ADI to its customers and vendors and harm its business, to disclose ADI's Confidential Information to third parties for purposes of obtaining the Charter Agreement for himself and/or for an entity or entities in which he held an interest, and to steal ADI's customers.

108.    IMS breached its contractual duty of good faith and fair dealing by allowing ADI's Confidential Information to be used by its Receiving Parties in violation of the IMS NDA by, among other things, being used by Receiving Party Mr. Markhoff to interfere with ADI's rights and interests in and to the Charter Agreement, to disparage ADI to its customers and vendors and

10622375

FENNEMORE CRAIG
PROFESSIONAL CORPORATION

harm its business, to disclose ADI's Confidential Information to third parties for purposes of obtaining the Charter Agreement for himself and/or for an entity or entities in which he held an interest, and to steal ADI's customers.

109.     As a direct and proximate result of the breach the covenant of good faith and fair dealing by Caesars, Mr. Markhoff, and IMS, ADI has sustained actual and consequential damages in an amount according to proof at trial but in excess of $12,000,000, exclusive of interest and costs.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Aerodynamics Incorporated and ADI Holdings Company, Inc. pray for relief against Defendants, as set forth below:

### ON THE FIRST CAUSE OF ACTION

#### (Against All Defendants)

1.     For damages in an amount according to proof at trial but in excess of $12,000,000, exclusive of interest and costs;

2.     For pre- and post-judgment interest;

3.     For the costs and expenses of suit, including attorney's fees as appropriate;

4.     For an award of punitive and exemplary damages based on Defendants' willful, wanton, and reckless misappropriation and disregard of ADI's rights in its trade secrets; and

5.     For such other and further relief as the Court deems just and proper.

### ON THE SECOND CAUSE OF ACTION

#### (Against Defendants Caesars and Markhoff)

6.     For damages in an amount according to proof at trial but in excess of $12,000,000, exclusive of interest and costs;

7.     For pre- and post-judgment interest;

10622375

FENNEMORE CRAIG
PROFESSIONAL CORPORATION

8.    For the costs and expenses of suit, including attorney's fees as appropriate; and

9.    For such other and further relief as the Court deems just and proper.

## ON THE THIRD CAUSE OF ACTION

### (Against Defendants IMS And Markhoff)

10.    For damages in an amount according to proof at trial but in excess of $12,000,000, exclusive of interest and costs;

11.    For pre- and post-judgment interest;

12.    For the costs and expenses of suit, including attorney's fees as appropriate; and

13.    For such other and further relief as the Court deems just and proper.

## ON THE FOURTH CAUSE OF ACTION

### (Against All Defendants Except The Vizer Entities)

14.    For damages in an amount according to proof at trial but in excess of $12,000,000, exclusive of interest and costs;

15.    For pre- and post-judgment interest;

16.    For the costs and expenses of suit, including attorney's fees as appropriate; and

17.    For such other and further relief as the Court deems just and proper.

DATED:  July 15, 2015

_/s/ Anthony W. Austin_
Anthony W. Austin (NV Bar No. 10850)
FENNEMORE CRAIG, P.C.
2394 East Camelback Road, Suite 600
Phoenix, Arizona 85016-3429
Telephone:  (602) 916-5343
Facsimile:  (602) 916-5543
Email:  aaustin@fclaw.com

C. Dana Hobart (CA Bar No. 125139)
   _(Pro Hac Vice Pending)_
HOBART LINZER LLP
777 S. Figueroa St., Ste. 4000
Los Angeles, CA 90017
Telephone:  (213) 225-8900
Facsimile: (213) 225-8929
Email:  dhobart@hobartlinzer.com

_Attorneys for Aerodynamics Incorporated_
_and ADI Holdings Company, Inc._

1

## DEMAND FOR JURY TRIAL

2

3       Plaintiff Aerodynamics Incorporated hereby requests a trial by jury.

4    DATED:  July 15, 2015

5

6                    /s/ Anthony W. Austin
              Anthony W. Austin (NV Bar No. 10850)
7             FENNEMORE CRAIG, P.C.
              2394 East Camelback Road, Suite 600
8             Phoenix, Arizona 85016-3429
              Telephone:  (602) 916-5343
9             Facsimile:  (602) 916-5543
              Email:  aaustin@fclaw.com

10            C. Dana Hobart (CA Bar No. 125139)
                (Pro Hac Vice Pending)
11            HOBART LINZER LLP
              777 S. Figueroa St., Ste. 4000
12            Los Angeles, CA 90017
              Telephone:  (213) 225-8900
13            Facsimile: (213) 225-8929
              Email:  dhobart@hobartlinzer.com
14

15            Attorneys for Aerodynamics Incorporated
              and ADI Holdings Company, Inc.
16

17

18

19

20

21

22

23

24

25

26

27

28

10622375