# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| AERODYNAMICS INCORPORATED, a Michigan corporation; ADI HOLDINGS COMPANY, INC., a Georgia corporation, | 2:15-cv-01344-JAD-PAL |
| Plaintiffs | **Order Granting Limited TRO, Setting Hearing on Motion for Preliminary Injunction, and Sealing Documents** |
| v. | [ECF 23, 39, 47] |
| CAESARS ENTERTAINMENT OPERATING COMPANY, INC., a Delaware corporation; STEVEN MARKHOFF, an individual; INTERNATIONAL MANAGEMENT SOLUTIONS, LLC, a Delaware corporation; VIA AIRLINES, INC., a Colorado corporation; VIA AIR, LLC, a Delaware corporation; and AMOS VIZER, an individual, | |
| Defendant | |

Plaintiffs Aerodynamics Incorporated and ADI Holdings Company, Inc. (collectively ADI) move for a temporary restraining order and preliminary injunction against defendants Steven Markhoff; Amos Vizer; Caesars Entertainment Operating Company, Inc. (Caesars); International Management Solutions, LLC (IMS); Via Airlines, Inc.; and Via Air, LLC.[1]  Defendants filed an unopposed motion for an order sealing one exhibit that they submitted in response to the motion.[2] ADI also moves unopposed for an order sealing five exhibits that it submitted in reply.[3]  Having reviewed the parties' pleadings,[4] points and authorities,[5] and supporting declarations and exhibits,[6] I find that ADI has met the standard for a narrowly tailored temporary injunction on its claims for

---

[1] ECF 23.

[2] ECF 39.

[3] ECF 47.

[4] ECF 1, 32.

[5] ECF 23, 33, 37, 39, 41, 47.

[6] ECF 24–27, 34–36, 38, 42–46.

1   breach of contract and misappropriation of trade secrets.  I thus grant the motion for temporary

2   restraining order and set the motion for preliminary injunction for hearing on an expedited briefing

3   schedule.  Until further order of this court, Markhoff, Vizer, IMS, Via Air, and Via Airlines are

4   restrained from acquiring, disclosing, or using any portion of ADI's (1) FAA-approved manuals; (2)

5   STM Master Charter Agreement; (3) Accounts Receivable Report as of March 31, 2005; (4) Cost

6   Template for Caesars Operations Actual Budget October 14th 2014; (5) agreements with aircraft

7   lessors Republic and Cymus; and (6) pool parts agreement with aircraft manufacturer and parts

8   vendor Embraer.

9          I find compelling reasons exist to seal portions of Exhibit 1 to ECF 34 and thus grant

10   defendants' motion to seal that exhibit, but instruct the parties to be prepared to discuss, at the

11   hearing of the preliminary injunction motion, unsealing that exhibit with the caveat that certain

12   information be redacted.  I also find compelling reasons exist to seal the entirety of Exhibits 2, 5, 6

13   and 8 to ECF 45 and thus grant ADI's motion to seal those exhibits.  But I deny ADI's motion as to

14   Exhibit 7, which is a screen shot of the contents of a Dropbox folder and appears to have been

15   mistakenly filed in place of the Caesars Master Air Contract Summary.

16                                              **Background**

17          ADI sues all of the defendants for misappropriation of trade secrets, and sues Caesars,

18   Markhoff, and IMS for breach of contract and breach of the covenant of good faith and fair dealing.[7]

19   Defendants answered the complaint by admitting the veracity of some of ADI's allegations but

20   denying that they misappropriated any of ADI's trade secrets or breached either agreement.[8]

21          ADI's claims center around two agreements.  The first is a non-disclosure agreement (NDA)

22   that ADI and Caesars, through Caesars' affiliate ESS Travel Management, entered into in October

23   2014 to protect the confidential information that would be exchanged while they negotiated an

24   agreement for Caesars to charter aircraft from ADI.[9]  Markhoff, then vice president of ESS Travel,

25   _____

26   [7] ECF 1.

27   [8] *See generally* ECF 32.

28   [9] ECF 24 ¶ 13; ECF 24-2 at 2–4.  The Embraer ERJ-145 50-seat regional jet is one of the two types
     of aircraft specifically contemplated under the charter agreement.

1  was ADI's point of contact at Caesars for the NDA and proposed charter agreement.[10]  The second

2  agreement is a letter of intent (LOI) that was entered into between ADI and IMS in February 2015,

3  for IMS's proposed purchase of all of the equity interests in ADI.[11]  IMS is Markhoff's company, and

4  he was ADI's point of contact at IMS for the LOI.[12]

5       ADI alleges that (1) Caesars and Markhoff breached the NDA; (2) Markhoff and IMS

6  breached the LOI; and (3) all of the defendants engaged in misappropriation when Markhoff shared

7  ADI's trade secrets with its competitor Via Air and Via Airlines (collectively Via).[13]  ADI also

8  alleges the defendants misappropriated ADI's trade secrets when Markhoff used, and Via Airlines'

9  chairman Vizer acquired and used, certain of ADI's trade secrets to negotiate with ADI's vendors

10  and customers on behalf of Via.[14]  It is undisputed that Caesars ultimately gave the charter agreement

11  to Via,[15] whom Markhoff attests had been a vendor of Caesars for several years.[16]

12       ADI now moves for a temporary restraining order against all of the defendants under its

13  breach of contract and misappropriation claims.[17]  ADI's counsel C. Dana Hobart, Esq. certifies that

14  the motion was served on counsel for all parties through the court's ECF system.[18]  In support of its

15  motion, ADI submitted (1) the declaration and supplement of Scott Beale, the former president, chief

16  executive officer, chairman of the board, and owner of ADI, with a collective 18 exhibits[19]; (2) the

17

18

---

[10] *See e.g.* ECF 35 ¶¶ 1–16.

19

[11] ECF 24 ¶ 19; ECF 24-2 at 2–9.

20

[12] *See* ECF 35 ¶¶ 34–35.

21

[13] ECF 1 ¶¶ 86–88, 96–97, 102.

22

[14] ECF 1 ¶¶ 52–59, 62–67, 72–80.

23

[15] ECF 32 ¶ 16.

24

[16] ECF 35 ¶ 49.

25

[17] ECF 23 at 21 n. 5.

26

[18] ECF 25 ¶ 2.

27

28

[19] ECF 24, 45, 46.

1    declaration and supplement of C. Dana Hobart, Esq. with a collective 11 exhibits[20]; (3) the

2    declaration of Darrell Richardson, the current president and chief operating officer of ADI, with two

3    exhibits[21]; (4) the declaration and supplement of Gerald P. Elder, owner of GPE Aviation Consulting

4    Group, Inc., with one exhibit[22]; (5) and the declaration of Larry Hecht, the chief operating officer of

5    Aerodynamics, Inc.[23]

6        Defendants responded with (1) the declaration of Richard Castro, director in the Corporate

7    Compliance and Investigations Department of Caesars Enterprise Services, LLC, with one exhibit[24];

8    (2) the declaration of Markhoff with four exhibits[25]; (3) and the declaration of Vizer.[26]  Defendants

9    also attached 15 exhibits, consisting of 383 pages, to their response, including the affidavit of Sue

10   Pavlak, chief operating officer of POWWOW, LLC dba PASS Charters, one of ADI's customers.[27]

11                                    **Discussion**

12   **I.      Motion for Temporary Injunctive Relief**

13       The legal standard for issuing a temporary restraining order with notice and the legal standard

14   for preliminary injunctive relief are "substantially identical."[28]  In *Winter v. Natural Resources*

15   *Defense Council, Inc.*, the Supreme Court clarified that, under these standards, the plaintiff "must

16   establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the

17   absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in

18   _____

19   [20] ECF 25, 42.

20   [21] ECF 26.

21   [22] ECF 27, 43.

22   [23] ECF 44.

23   [24] ECF 34.

24   [25] ECF 35.

25   [26] ECF 36.

26   [27] ECF 33-1–33-15.

27

28   [28] *See Stuhlbarg Intern. Sales Co., Inc. v. John D. Brush and Co., Inc.*, 240 F.3d 832, 839 n. 7 (9th
     Cir. 2001) (stating that the "analysis is substantially identical for the injunction and the TRO").

1   the public interest."[29]  The Ninth Circuit subsequently recognized in *Stormans, Inc. v. Selecky* that

2   the Supreme Court had "definitively refuted" the circuit's possibility-of-irreparable-harm test.[30]

3   However, several panels of the Ninth Circuit have since instructed that "if a plaintiff can only show

4   that there are 'serious questions going to the merits'—a lesser showing than likelihood of success on

5   the merits—then a preliminary injunction may still issue if the 'balance of hardships tips *sharply* in

6   the plaintiff's favor,' and the other two *Winter* factors are satisfied."[31]

7          **A.      Likelihood of success on the merits**

8          ADI alleges that I have jurisdiction over the subject-matter of this action under 28 U.S.C. §

9   1332 because the parties are diverse and the amount in controversy exceeds $75,000.[32]  Under *Erie*

10  *R. Co. v. Tompkins*, federal courts sitting in diversity apply state substantive law and federal

11  procedural law.[33]

12          **1.      *Breach of contract***

13         Both of the agreements at issue contain Nevada choice-of-law provisions.[34]  To state a valid

14  claim for breach of a written contract under Nevada law, the plaintiff must allege the existence of a

15  valid agreement between the plaintiff and the defendant, a material breach by the defendant, and

16  damages.[35]

17         Defendants acknowledge "[t]here is no dispute that Caesars and ADI executed a mutual non-

18  disclosure agreement, and there is no dispute that IMS and ADI executed a letter of intent that

19  _____

20  [29] *Winter v. Nat. Resources Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

21  [30]  *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1127 (9th Cir. 2009) (citing *Winter*, 555 U.S. at 22).

22  [31] *Shell Offshore, Inc. v. Greenpeace, Inc.*, 709 F.3d 1281, 1291 (9th Cir. 2013) (quoting with
23  emphasis *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011)); *accord*
    *Towery v. Brewer*, 672 F.3d 650, 657 (9th Cir. 2012) (quoting *Cottrell*, 632 F.3d at 1135).
24

25  [32] ECF 1 ¶ 1.

26  [33] *Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938); *accord Gasperini v. Ctr. for Humanities, Inc.*, 518
    U.S. 415, 427 (1996).
27

28  [34] ECF 24-2 at 3 ¶ 10; ECF 24-3 at 6 ¶ 9(d).

[35] *See Bernard v. Rockhill Dev. Co.*, 734 P.2d 1238, 1240 (Nev. 1987) (per curiam).

1  contained a confidentiality provision."[36]  Defendants do deny, however, that ADI has met its burden

2  of demonstrating that it is likely to succeed on the merits of the breach and damages elements.

3                              *a.       Breach*

4          Caesers and Markhoff argue that the breach element turns on the alleged disclosure of ADI's

5  trade secrets to ADI's potential aircraft seller General Electric Capital Aviation Services (GE

6  Capital), ADI's aircraft lessors Republic Airways Holdings, Cymus Holdings, and ADI's customer

7  PASS Charters, Inc.[37]  Defendants continue, if the alleged disclosures occurred—which they

8  deny—Caesars and Markhoff cannot be in breach of the NDA because the disclosed-to entities

9  already possessed ADI's trade secrets.[38]  Nor can Markhoff or IMS be in breach of the LOI because

10  ADI gave them permission to speak with Cymus and Republic as part of the due diligence Markhoff

11  and IMS conducted to potentially acquire ADI.[39]

12          Defendants' argument misses the mark.  ADI does not allege that mere disclosure to third

13  parties was a breach of the NDA or LOI, but that disclosure to third parties *for reasons contrary to*

14  *the stated purposes of those agreements* was the breach.[40]  To that point, ADI argues that Markhoff

15  and Caesars breached the NDA, and Markhoff and IMS breached the LOI, by using ADI's

16  confidential and trade-secret information to interfere with ADI's agreements with PASS Charters.[41]

17  ADI also argues that in violation of the LOI, Markhoff and IMS allowed an employee of Via, ADI's

18  competitor, to access and review ADI's confidential and trade-secret information under the guise that

19

20  ───────────────

21  [36] ECF 33 at 13:9–11.

22  [37] ECF 33 at 13:13–14.

23  [38] ECF 33 at 13:13–22.

24  [39] ECF 33 at 13:22–14:02.

25

26  [40] ECF 1 ¶¶ 96–97, 102;  ECF 24-2 at 2 ¶ 2 ("Mutual Business Purpose of Disclosure"of the NDA
    was a "business transaction including the possible chartering of aircraft from [ADI] by [Caesars]");

27  ECF 24-3 at 2 (purpose of the LOI was the "proposed purchase of all the equity interests of ADI"
    by IMS).

28
    [41] ECF 23 at 16:19–17:7.

1    she was an "independent forensic accountant" for Markhoff and IMS.[42]  ADI further contends that

2    after both Caesars and IMS terminated their respective negotiations with ADI and in violation of the

3    NDA and LOI, Markhoff and Vizer used ADI's confidential and trade-secret information to negotiate

4    contracts for Via's benefit with ADI's aircraft manufacturer and parts vendor Embraer, ADI's

5    aircraft lessors Republic and Cymus, and ADI's potential aircraft seller GE Capital.[43]  ADI's theory

6    for holding Caesars liable for Markhoff's acts and omissions is based on paragraph four of the NDA,

7    which defines "Related Persons" and provides that ADI and Caesars will "be responsible for any acts

8    or omissions [of their respective] Related Persons that result in a breach of this Agreement."[44]  ADI

9    alleges that Markhoff is one of Caesars' "Related Persons."[45]

10        Regarding the ADI-PASS Charters agreement, ADI presents evidence in the form of a

11   declaration from Scott Beale[46] stating that Markhoff used, and allowed Vizer[47] to acquire and use,

12   ADI's trade-secret and confidential information in order to usurp ADI's on-demand–charter-flight

13   agreement with PASS Charters for Via's benefit.[48]  Defendants respond with the affidavit of Sue

14   Pavlak, chief operating officer of PASS Charters, who attests that: (1) the ADI-Pass Charters

15   agreement was mutually terminated between the two for other reasons[49]; (2) *she* arranged the meeting

16   in February 2015 with Markhoff, whom she believed was acting solely on behalf of Caesars, to

17   discuss an agreement between Caesars and PASS Charters[50]; (3) neither Markhoff nor Via Airlines

18

19

---

20   [42] ECF 23 at 13:01–14:13.

21   [43] ECF 23 at 15:14–18:10.

22   [44] ECF 24-2 at 2–3 ¶ 4.

23   [45] ECF 1 ¶ 83.

24   [46] Beale is the former president, chief executive officer, chairman, and owner of ADI.  ECF 24 ¶ 1.

25   [47] Vizer is the chairman of Via Airlines.  ECF 36 ¶ 5.

26   [48] ECF 24 ¶¶ 27–28.

27   [49] ECF 33-15 ¶¶ 7–8.

28   [50] ECF 33-15 ¶¶ 9–10.

shared any information, confidential or otherwise, with her regarding ADI[51]; (4) PASS Charters "selected to use [Via Airlines'] charters services in place of ADI's" because of the past relationship between PASS Charters and Via Airlines and PASS Charters' customers' complaints about ADI[52]; and (5) ADI's alleged "NCAA clients" are really PASS Charters' clients as ADI was "merely a vendor for transportation services."[53]

As for Via's access to ADI's confidential and trade-secret information, Beale attests that after IMS and ADI entered into the LOI, Markhoff represented to him that in order for IMS's "partners" to address "a revised offer for sale[,]" they required "an independent forensic accountant identified only as 'Marina' to visit ADI's facilities and conduct a further analysis of ADI's trade secrets."[54] Beale allowed the inspection and limited it "to reviewing, but not copying" ADI's information.[55] According to Beale, he and James Carroll, accounting manager for ADI, conducted a short briefing with Marina on February 12, 2015, where she evaded basic questions about her background.[56] But Beale states that, at Markhoff's urging and because he felt secure under the confidentiality agreements, Marina was granted "unfettered access" to ADI's confidential documents with the caveat that she look, not copy.[57] Beale claims that Marina "became angry when she was told she would not be permitted to take ADI's digital QuickBooks financial database" back to her hotel and used her personal cell phone to call Markhoff so that he "could pressure ADI into increasing her access."[58]

---

[51] ECF 33-15 ¶¶ 11, 13.

[52] ECF 33-15 ¶¶ 13–14.

[53] ECF 33-15 ¶ 13.

[54] ECF 24 ¶ 19.

[55] ECF 24 ¶ 19.

[56] ECF 24 ¶ 20.

[57] ECF 24 ¶ 20.

[58] ECF 24 ¶ 21.

1    Beale states that when Marina returned the next day, he was informed by Carroll and Mike

2    Hoyle, "a subtenant of office space at ADI's facility," that "they witnessed Marina taking pictures of

3    ADI documents with her personal cell phone."[59]  Beale claims that, after he confronted and informed

4    Marina that she would be removed if she kept taking photographs, she was "visibly upset" and left

5    the building saying she was going to take lunch, but she never returned.[60]

6    Hours after Marina left ADI's offices, Beale received an email from Markhoff "on behalf of

7    IMS 'terminating our diligence and our interest in acquiring'" ADI.[61]  Beale attests that a true and

8    correct copy of that email is attached to his initial declaration as Exhibit 5.[62]  Three days later,

9    Markhoff, this time on behalf of Caesars, sent ADI a letter stating that "Caesars has elected to no

10   longer pursue a contract with ADI to operate aircraft for the Caesars air network."[63]  Darrell

11   Richardson, current president and chief operating officer of ADI, attests that a true and correct copy

12   of that letter is attached to his declaration as Exhibit 1.[64]

13   Beale says he later discovered that "Marina" is Marina Morgan—the financial director for

14   Via Air, LLC.[65]  All defendants, save Caesars, admit Marina Morgan holds that position.[66]  Although

15   defendants submitted declarations from Markhoff and Vizer, neither addresses Marina's alleged

16   presence and activities at ADI's offices in mid-February 2015.

17   _____

18   [59] ECF 24 ¶ 22.  District courts may consider hearsay evidence "in deciding whether to issue a
     preliminary injunction." *Johnson v. Couturier*, 572 F.3d 1067, 1083 (9th Cir. 2009) (citing

19   *Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1363 (9th Cir. 1988) (en banc); *Flynt
     Distrib. Co. v. Harvey*, 734 F.2d 1389, 1394 (9th Cir. 1984)).

20

21   [60] ECF 24 ¶ 22.  ADI's complaint tells a slightly different story: ADI asked Marina to leave after
     she was discovered taking photographs of ADI's confidential documents.  ECF 1 ¶ 66.  The

22   difference, however, is not relevant to whether or not ADI is likely to prove breach.

23   [61] ECF 24 ¶ 24.

24   [62] ECF 24 ¶ 24; ECF 24-5.

25   [63] ECF 26 ¶ 3.

26   [64] ECF 26 ¶ 3; ECF 26-1.

27   [65] ECF 24 ¶ 23.

28   [66] ECF 32 at ¶ 64.  Caesars was without sufficient knowledge to admit or deny that allegation.

1    The remainder of ADI's breach allegations concern actions taken by Markhoff, IMS, Vizer,

2    and Via after both IMS and Caesars terminated their respective potential relationships with ADI.

3    Beale attests that ADI allowed Markhoff to "review[]" the Embraer pool parts agreement as part of

4    the "unfettered access" it gave Markhoff to ADI's confidential and trade-secret information.[67]

5    Markhoff states that, during his due diligence, ADI "disclosed" to him the fact that it had an

6    agreement with Embraer for pool or spare parts and that he has personally negotiated similar

7    agreements.[68]

8         Richardson attests that on March 28, 2015, Andre op't Hof, vice president of sales and

9    business development for Embraer Aircraft Customer Services, Inc., exchanged emails with him

10   regarding that agreement,[69] and he supplies their email exchange as Exhibit 2 to his declaration.  In

11   the exchange, "Andre" discloses to Richardson that Embraer is "engaged in a negotiation with

12   another operator" that "might soon operate a number of" ERJ jets into "Las Vegas for a local

13   entertainment company."[70]  Andre goes on to state that, much to Embraer's "surprise and

14   displeasure, we are let [sic] to believe that they have access to a copy of the Embraer-ADI exchange

15   Pool agreement."[71]  Andre expresses disbelief because that would violate the Embraer-ADI non-

16   disclosure agreement, and he asks Richardson to clarify.[72]  Richardson responds that he will need to

17   conduct an internal investigation into the matter and asks if Andre could disclose the identity of the

18   person or company that Embraer is negotiating with.[73]  Andre replies, "In confidence, Steven

19   Markhoff from Caesars Entertainment.  I believe they looked at ADI in the context of a possible

20

21   _____

22   [67] ECF 24 ¶ 14.

23   [68] ECF 35 ¶ 45.

24   [69] ECF 26 ¶ 4.

25   [70] ECF 26-2 at 2.

26   [71] ECF 26-2 at 2.

27   [72] ECF 26-2 at 2.

28   [73] ECF 26-2 at 2.

1   acquisition."[74]  Defendants did not directly respond to this evidence.  Markhoff admits that "he

2   communicated with Embraer[,]"[75] but cryptically attests only that neither he nor Via has "ever

3   *entered* into a contract with Embraer for a pool parts agreement."[76]

4          As for ADI's lease with Cymus, Beale attests that Markhoff contacted Cymus and "requested

5   a term sheet to lease the same two aircraft that Cymus was already leasing to ADI."[77]  Beale claims

6   Markhoff knew to go after the Cymus lease because he learned from ADI's confidential and trade-

7   secret information that ADI was behind in its payments to Cymus.[78]  Beale states that Markhoff

8   "used this information in an attempt to convince Cymus to terminate its leases with ADI and,

9   thereafter, lease the aircraft to" Via.[79]  Markhoff's only comment regarding Cymus is that ADI gave

10  him permission to speak directly with that vendor as part of the due diligence he was conducting

11  under the LOI.[80]

12         Beale attests that on February 19, 2015, he had a telephonic conversation with Chris

13  Beers—leasing agent at Skyworld Aviation and whom ADI works with in its leases with Republic

14  and Cymus[81]—and Beers told him that Markhoff and Vizer attended a meeting with Republic

15  executives on February 17, 2015.  Beale attests that, according to Beers, Markhoff stated at the

16  meeting that "he was going to be resigning from Caesars to join the Vizer companies [Via Air and

17  Via Airlines]" and that he had never planned to acquire ADI, but to "'steal ADI's business and put

18

19

20  ─────────────────

21  [74] ECF 26-2 at 2.

22  [75] ECF 26 ¶ 79(c).

23  [76] ECF 35 ¶ 46 (emphasis added).

24  [77] ECF 23 ¶¶ 25–26.

25  [78] ECF 24 ¶¶ 25–26.

26  [79] ECF 24 ¶ 26.

27  [80] ECF 35 ¶¶ 42, 44.

28  [81] ECF 24 ¶ 37.

them out of business.'"[82]  Beale further attests that, according to Beers, Vizer confirmed the

statements Markhoff made during that meeting.[83]  Markhoff acknowledges he met with Republic but

states it was Republic who suggested Via lease the then ADI-leased aircraft "in order to operate the

Caesars network."[84]  Markhoff continues, "After [he] started working with Via Airlines on the

Republic aircraft leases, Republic decided against providing the aircraft for lease to [Via and

Caesars] for the stated reason that it could complicate [Republic's] pilot union negotiations."[85]  Vizer

offers no statement in his declaration about the meeting he allegedly attended with Markhoff and

representatives for Republic.[86]

Beale attests that he engaged in "extensive negotiations with Jim Steckart," the senior vice

president of marketing for GE Capital, "to purchase five Embraer ERJ-145 regional jets to add to the

aircraft [in] ADI's fleet and, particularly, to enable ADI to fulfill the" proposed charter agreement

with Caesars.[87]  The negotiations ended with a letter of intent for ADI to purchase five specific

Embraer ERJ-145 regional jets from GE Capital, which Beale attests is attached to his initial

declaration as Exhibit 8.[88]  Beale goes on to state that he provided Markhoff with a copy of the GE

Capital letter of intent in January 2015, and explained to Markhoff why it was an "attractive and

unique opportunity."[89]  According to Markhoff, after Republic decided against leasing aircraft to Via

Airlines, he reached out to his contact at GE Capital, Jim Steckart, and Via ultimately purchased five

---

[82] ECF 24 ¶ 38.

[83] ECF 24 ¶ 38.

[84] ECF 35 ¶ 48.

[85] ECF 35 ¶ 50.

[86] *See generally* ECF 36.

[87] ECF 24 ¶ 31.

[88] ECF 24 ¶ 31; ECF 24-8.

[89] ECF ¶ 32.

1   ERJ-145LR jets from GE Capital in June 2015.[90]   But, Markhoff claims, ADI did not "disclose any

2   letters of intent with" GE Capital to him, and that the first time he "became aware of this alleged

3   letter of intent was once [he] reviewed ADI's motion."[91]   In reply, however, ADI submitted evidence

4   tending to show that one of the jets contemplated under the GE Capital letter of intent is the same jet

5   that Markhoff helped Via purchase from GE Capital.[92]

6         On this evidence, I find ADI has not shown it is likely to demonstrate that either Markhoff or

7   IMS breached the LOI with regard to the PASS Charters agreement.   I do find, however, that ADI

8   has shown it is likely to demonstrate breaches based on: (1) Markhoff and IMS allowing an

9   employee of Via to access and review ADI's confidential and trade secret information under the

10   representation that she was their "independent forensic accountant"; and (2) Markhoff using and

11   disclosing and Vizer acquiring and using ADI's confidential or trade-secret information to negotiate,

12   whether successfully or not, similar deals with Embraer, Republic, Cymus, and GE Capital for Via's

13   benefit.

14                        b.      Damages

15         ADI argues that it was damaged as a result of the alleged breaches by losing the charter

16   agreement with Caesars to Via.   Caesars responds that ADI lost the charter agreement because

17   Caesars had determined that ADI was "an unsuitable vendor for Caesars."   According to Richard

18   Castro, director of Caesars' corporate compliance and investigations department, that decision was

19   based on the fact that a $600,000 judgment had been entered against Beale personally in a civil fraud

20   action.[93]   Based on this evidence, I find that ADI has not shown it is likely to demonstrate the harm it

21   suffered in losing the charter agreement was the result of a breach of the NDA.

22         ADI has, however, raised serious questions on the merits of whether it was damaged as a

23   result of the use, disclosure, and acquisition of the confidential and trade-secret information

---

[90] ECF 35 ¶ 53.

[91] ECF 35 ¶ 39.

[92] ECF 24 ¶ 33; ECF 24-9, 24-10.

[93] See ECF 34 ¶¶ 11–14.

1    contained in ADI's agreements with GE Capital, Republic, Cymus, and Embraer by Markhoff, Vizer,

2    and Via.  ADI has shown a reasonable probability that it lost at least one jet contemplated under the

3    GE Capital letter of intent to Via and that its goodwill, reputation, business interests, and bargaining

4    power with Embraer, Republic, and Cymus were damaged as a result of the alleged breaches.  ADI

5    has also shown a reasonable probability that Via gained an unfair advantage as a result of its

6    financial director gaining access to ADI's confidential or trade-secret information under the

7    representation that she was an independent forensic accountant for Markhoff and IMS.

8                  **2.       *Misappropriation of trade secrets***

9            "Nevada's Uniform Trade Secrets Act, NRS Chapter 600A, provides that the '[a]ctual or

10   threatened misappropriation [of a trade secret] may be enjoined.'"[94]  To successfully maintain a

11   claim for misappropriation of trade secrets under Nevada law, the plaintiff must demonstrate (1) the

12   existence of a "valuable trade secret"; (2) "misappropriation of the trade secret through [acquisition,]

13   use, disclosure, or nondisclosure of use of the trade secret"; and (3) that misappropriation was

14   improper because it was made in breach of an express or implied contract or by a party with a duty

15   not to disclose."[95]

16                  *a.       Existence of trade secrets*

17           "[A] trade secret is information that '[d]erives independent economic value, actual or

18   potential, from not being generally known to, and not being readily ascertainable by proper means by

19   the public,' as well as information that '[i]s subject to efforts that are reasonable under the

20   circumstances to maintain its secrecy.'"[96]  "Whether information is a trade secret generally is a

21   question of fact."[97]  The court considers four factors:

22

23   _____

24   [94] *Finkel v. Cashman Prof., Inc.*, 270 P.3d 1259, 1263–64 (Nev. 2012) (quoting NEV. REV. STAT. §
25   600A.040(1)).

26   [95] *Kaldi v. Farmers Ins. Exch.*, 21 P.3d 16, 23 (Nev. 2001) (quoting *Frantz v. Johnson*, 999 P.2d
     351, 358 (Nev. 2000)); *accord* NEV. REV. STAT. § 600A.030.

27   [96] *Finkel*, 270 P.3d at 1264 (quoting NEV. REV. STAT. § 600A.030(5)(a)–(b)).

28   [97] *Finkel*, 270 P.3d at 1264 (citing *Frantz*, 999 P.2d at 358).

1    (1) the extent to which the information is known outside of the
     business and the ease or difficulty with which the acquired information
2    could be properly acquired by others; (2) whether the information was
     confidential or secret; (3) the extent and manner in which the employer
3    guarded the secrecy of the information; and (4) the former employee's
     knowledge of . . . [the alleged trade secret] and whether this
4    information is known by the employer's competitors. . . .[98]

5    An analysis of these factors compels the conclusion that a number of the items identified by ADI

6    qualify as trade secrets.

7                              i.        FAA-approved operational manuals

8             According to Beale, ADI's FAA-approved manuals and operations specifications "contain

9    all of ADI's procedures, personnel, many supplier lists, business procedures, capabilities, product

10   designs and specifications, unpatented inventions, formulas, techniques, and other business

11   information that provides ADI with a competitive edge."[99]  Beale attests that the cost of developing

12   the manuals and specifications for its Part 121 certification process to fly 50-seat jets was "at least $1

13   million" and ADI has since "spent thousands of hours improving and revising the manuals."[100]

14   "With more than a decade of work in total," Beale attests that "ADI has an efficient and proven

15   operational system that would take years to duplicate [and] cost multiple millions of dollars."[101]

16   Supporting Beale's statements is the declaration ADI submitted from Gerald P. Elder, "owner of

17   GPE Aviation Consulting Group, Inc., which provides consulting services to airlines on a wide range

18   of subjects including applications for Federal Aviation Administration certification."[102]  Elder attests

19   that GPE's typical proposal for Part 121 certification process is "30 weeks from commencement of

20   GPE support to issuance" of the specifications, with an estimated cost for those services being

21   "$635,400."[103]

22   _____

23   [98] *Id.* (quoting *Frantz*, 999 P.2d at 358–59).

24   [99] ECF 45 ¶ 6.

25   [100] ECF 24 ¶ 3.

26   [101] ECF 24 ¶ 3.

27   [102] ECF 27 ¶ 1.

28   [103] ECF 27 ¶ 4.